FOSS-SCHNEIDER BREWING CO. v. BULLOCK et al.

(Circuit Court of Appeals, Sixth Circuit. November 6, 1893.)

No. 93.

1. LIMITATION OF ACTIONS—WHEN ACTION ACCRUES.
Where a seller refuses to acquiesce in the cancellation of a contract of sale by the purchaser, but delivers the goods, his right of action accrues, not at the time of such attempted cancellation, but at the time of the delivery.

2. SALE—ACCEPTANCE.
Purchasers of rice informed the seller that they canceled and repudiated the contract of sale, notwithstanding which the goods were shipped, and were received and stored by the purchasers, by mistake. After discovering their mistake, the purchasers failed to notify the seller for more than a month. *Held,* that the delay, in view of the fluctuating market price of the goods, was so unreasonable as to amount to an acceptance.

**3. SECONDARY EVIDENCE—CONTENTS OF LETTER—EXISTENCE OF ORIGINAL.**
    Evidence of the contents of an alleged letter, not shown to have been
    written and lost, and which, from other correspondence, appears never
    to have been in fact written, is inadmissible.

In Error to the Circuit Court of the United States for the Western Division of the Southern District of Ohio. ·

At Law. Action by Thomas O. Bullock and Lydia P. Bullock against the Foss-Schneider Brewing Company to recover for goods sold and delivered. Verdict for plaintiffs directed by the court, and judgment for plaintiffs thereon. Defendant brings error. Affirmed.

Statement by TAFT, Circuit Judge:

This was an action begun in the circuit court for the southern district of Ohio November 12, 1891, to recover $2,215.67, as the balance claimed to be due to T. O. Bullock and Lydia P. Bullock, partners as Bullock & Co., of the city of New York, the defendants in error and the plaintiffs below, from the Foss-Schneider Brewing Company, a corporation of Ohio, for two car loads or 350 bags of broken rice, weighing in all 84,612 pounds, at $2.85 per hundred pounds, sold and delivered to the brewing company on the 21st day of November, 1885. A credit was given to the brewing company for $195.78, the freight on the rice, which was paid by the brewing company at the time the rice was received.

The defendant, for answer, first pleaded that the cause of action stated did not accrue within six years before the filing of the petition. For a second defense the defendant denied that any contract of sale had ever been entered into for the purchase of the rice referred to in the petition, but alleged that some time prior to November 1, 1885, the plaintiffs had consigned to the defendant, at Cincinnati, two car loads of rice, without the consent or order of defendant; that at about the same time defendant had ordered two car loads of rice from other persons than the plaintiffs; that, when the defendant was notified by the railroad company that two car loads of rice had been received at the depot for it, it paid the freight upon the two car loads of rice sent by the plaintiffs, by mistake, supposing that it was paying the freight upon the rice which it had ordered; that, with the same mistaken idea, defendant received the rice, and stored it in its brewery at Cincinnati; and that, immediately upon the discovery of the mistake, defendant notified plaintiffs of it, and that the rice thus delivered and received was held subject to the order of plaintiffs, and not otherwise. By way of cross petition, defendant asked judgment for $1,800 for the price of storing the rice for the plaintiffs since 1885.

The facts, as developed by the evidence, were as follows:

Bullock & Co. were a firm dealing in rice at New York city. The Foss-Schneider Brewing Company was a brewing corporation of Cincinnati using rice in its manufacture of beer. The brewing company gave to one Louis Burger, in November, 1884, an order for four car loads of rice, at the lowest price that he could get it for them. An agent of Bullock & Co. called upon the brewing company shortly after this, and asked to sell them rice. They referred him to Burger, to whom they had given their order. He went to Burger, and made a contract evidenced as follows: "November 22, 1884. Four cars best broken rice for Foss-Schneider Brewing Company, $2.85 delivered. Commission on this lot, $35, to Louis Burger. First car first week in December, others to follow when ordered, about two weeks apart. Send sample of all kinds." On December 8th, Bullock & Co. sent the following letter to Foss-Schneider Brewing Company. "We have shipped you, as per inclosed invoice and B. L., car best broken rice, November 29th, cash, $1,042.04. Your order for rice given to Mr. Louis Burger was turned over to us for execution, and which we are pleased to fill for you. Please send us expense bill, when paid, and oblige." Two cars, under this order, were delivered to the Foss-Schneider Brewing Company. On the 20th of December following, and before any others were delivered, Bullock & Co. made another contract directly with the

Foss-Schneider Brewing Company, evidenced by the following: "Cincinnati, December 20, 1884. Sold to the above brewing company five (5) cars broken rice at $2.80, delivered Cincinnati, to be shipped as ordered, with the privilege up to ten (10) cars more at the same price, to be shipped during the year 1885. Bullock & Co. The Foss-Schneider Brewing Company, by Frank Overbeck, President." This last sale was negotiated without the intervention of Burger. Burger felt very indignant at this course on the part of Bullock & Co., and by letter December 31, 1884, complained of their sale at a less price than that at which he (Burger) had sold their rice to the brewing company in the first contract, and used the following language: "Consequently, said brewery does not want any more rice upon the contract entered with me, but has canceled the same, on your action taken in the matter. * * * You had no right to interfere with the contract existing, the details of which you knew, and I now look upon you for your remitting me commission on four cars at $35 each,—$140." Answering this, Bullock & Co. by letter, January 23, 1885, said: "We have no desire to save the commission on the four cars, and will pay it to you, as agreed, after shipments are made, and acceptance of same. Please let us know at once when we shall ship the remaining two cars." Burger, later, in letter January 7, 1885, again announces the cancellation of the first contract, to which, by letter of January 10, 1885. Bullock & Co. replied: "We did not induce, wish, or request that they (F. S. B. Co.) cancel the order they gave you, nor have we canceled it, nor do we see any reason why we should, and are ready to ship the remaining two cars when you instruct us to, which instructions we await." On January 6, 1885, the Foss-Schneider Brewing Company, in response to a letter from Bullock & Co. offering to extend the payment for the two car loads of rice already sent, the brewing company declined to accept the favor, and denied the desire on their part for delay in the payment, and referred, presumably, to the shipment of the remaining two cars on the Burger contract, as follows: "Furthermore, as Mr. Burger did not, and said he could not, live up to the conditions upon which we agreed to take a certain number of cars of rice from him, we canceled and countermanded all our conditional orders for rice with Burger." In the letter of January 10, 1885, to the brewing company, Bullock & Co. make no response to this notice of cancellation, and simply use the expression: "Kindly inform us when we may ship you another car of rice." It should be noted, also, that on 23d December, 1884, the brewing company notified Bullock & Co. that they had learned that Bullock & Co. were offering rice at $2.75. They close their letter with these words. "The contract, therefore, we made with you, we consider null and void, until we hear from you." This referred to the second contract. Subsequently, however, the brewing company did receive the five cars of rice on the second contract, and paid for them. They were delivered March 7th, April 17th, May 28th, July 6th, and August 27th, in the year 1885.

In June or July, 1885, Burger sued Bullock & Co. for the commission on the sale of the other two cars under the Burger contract, and garnished money of Bullock & Co. in the hands of Foss-Schneider Brewing Company, and recovered before a magistrate a judgment, which was deducted by the Foss-Schneider Brewing Company from their payment to Bullock & Co.

In September, Bullock & Co. asked the brewing company whether they needed any more rice. They replied that they did not. A similar request was made in October, to which a similar answer was given, and the same question and response occurred on November 7th. Upon November 10th Bullock & Co. sent a telegram to Mr. Douglass, who had been their attorney in the garnishee suit, as follows: "Shall we ship Foss-Schneider Brewing Company, or Burger?" To which Douglass, after seeing Overbeck, telegraphed: "Ship Foss-Schneider Brewing Company." Accordingly, on November 14th, Bullock & Co. shipped two car loads of rice to Foss-Schneider Brewing Company.

On November 14, 1885, Bullock & Co. wrote as follows: "The Foss-Schneider Brewing Company: We take pleasure in handing you in this invoice and bill of lading for two car loads best broken rice, November 10th, cash, $2,411.44, less freight, as per order received through Mr. Louis Burger. Trust-

ing this lot will give the usual satisfaction, we remain." To which the brewing company responded by telegram of November 16th: "Bill lading two cars rice received. Will not accept same. Never ordered them through Burger." Thereupon, Bullock & Co. telegraphed their attorney, on the same day, as follows: "Foss & Schneider telegraph us they won't receive the two car loads shipped them. What shall we do?" To which their attorney responded, after seeing Mr. Overbeck: "Think can get Foss-Schneider to take rice, if they get four months' time. I advise acceptance." To the Foss-Schneider Brewing Company, Bullock & Co. telegraphed as follows, November 16, 1885: "You deducted from your remittance commission on these very two car loads just shipped. Our attorney, Howard Douglass, Cincinnati, telegraphed us to ship, and think Burger's attorney instructed shipment. Settle this matter with Burger, who ordered for you." November 21st, Bullock & Co., after repeating the correspondence by telegram, say: "We have been so very busy getting what rice we could off, as freight advanced 40 per cent. on the 18th, and yesterday the new rate of duty took effect,—that is, 2¼ cents pound on the same size grain we shipped you,—an advance of 185 per 100 pounds; the same duty as whole rice. We wanted to protect ourselves, and have shipped over seven thousand bags this week. We note that you say you never ordered this from Burger, and yet this is just what Burger brought his sham suit against us for, and you paid the money into court on the very two cars. Since your telegram, we have another one from Howard Douglass, who says he thinks you will take, if we give you four months' time, to which we replied that we were always willing to accommodate you; and if you would give us your four-months' note, adding interest from receipt of goods, we would accept it, and, as Burger was to have a good commission out of this, that you make him pay the interest that you add to the note." To which letter the brewing company responded on the 25th November: "Yours of the 21st received. Mr. Howard Douglass nor anybody else had any right to think that we would accept the rice if you gave us four months' time. None ever approached us on this subject, and consequently we never intimated anything of the kind. * * * As already informed you, we will not accept the rice under any terms. Hoping that this unpleasantness will soon cease, we are, etc."

During this correspondence, the two car loads of rice shipped by Bullock & Co. reached Cincinnati, and were weighed for the defendant,—one car upon November 21, 1885, and the other November 28, 1885,—and the freight was paid by the defendant upon the same days. The rice was hauled to the defendant's brewery by the brewery wagons. The defendant's agents supposed that this rice was rice ordered and shipped from Kuntz & Co., of New York. The Kuntz rice arrived on the 5th of December, at which time the mistake was discovered. The rice of Bullock & Co. was stored in the brewery warehouse until the 2d of January, 1886, when Bullock & Co. wrote the brewing company the following: "Our invoice November 10th, $2,411.44, is now past due. Will you, on receipt of this, kindly send us exchange for the above amount, less freight? The freight bills, please send us. Should you want any extension of time, we would be very glad to accommodate you; you adding interest after thirty days, and sending us your note for such time as will suit you." To which the defendant replied, January 4, 1885: "Yours of the 2nd inst. received. We beg you to understand that we do not owe you anything. The rice you shipped here we will not accept, and, if Mr. Louis Burger ordered same, you must look to him." To which Bullock & Co. replied, January 6th: "We have your favor of the 4th all noted. We are a little staggered at your remark that you do not owe us anything, and will not accept the rice we shipped you, when we know that you have accepted the rice, and had one car since November 21st, the other car November 27th, and paid the freight on both cars November 25th. You have had this rice now, one car 46 days, the other car 40 days,—an average of 43 days. This should now be settled, and must confirm our letter January 2nd, requesting exchange for amount due us, or, if you want some longer time, your note adding interest after 30 days. The interest, and any difference in price, you must look to Mr. Burger for." To which the brewing company responded, January 9, 1886: "Yours of the 6th received. We again repeat.

that we do not owe you anything. You also do not know that we accepted the rice, for whoever informed you so knows nothing about it. The rice you shipped is stored, and we will not use one grain of it. When the proper time comes, we will prove how, in mistake, we paid freight on the rice you shipped after having notified the railroad company that we would not accept same, since, at the same time there was a shipment of rice in the depot for us, which we had bought from some other house. Let this end all unnecessary correspondence." There was a long subsequent correspondence, which throws no light upon the case, except that it states the claims of the parties.

Overbeck, the president of the brewing company, was ill, and not able to be present at the trial. By agreement, a statement of his was introduced as a deposition, in which he said: "On November 16, 1885, Bullock & Co. shipped us the two remaining cars rice countermanded with Burger Bros., whereupon, we telegraphed Bullock & Co. that we would not accept them, as we had never ordered them through Burger. On or about November 25th, two cars rice arrived in the depot here, at the same time together with two cars rice which we bought from Chas. Kuntz & Co., New York; and by mistake our secretary at the time, Mr. Chas. Klein, paid the freight on the two cars from Bullock & Co., instead of those from Chas. Kuntz & Co., and in that way the two cars from Bullock & Co. were taken into our house by mistake. But of all of this we notified Bullock & Co. at once by letter, stating the rice was stored at their expense, and that we refused acceptance of same."

Mr. Bullock testified that the letter of January 9th, received on January 12th, was the first letter written them by the brewing company, in which they had been notified that the rice had been received under mistake.

The market price of rice in Cincinnati from November, 1884, to November, 1885, was affected by the varying freights from New York to Cincinnati. There was a decline in the spring of 1885 of about $70 a car. There was an advance early in November back to the March and April rates of $60 or $70 a car, and a still further advance, later in the same month, of $50 or $60 a car.

At the close of the evidence the court directed the jury to return a verdict for the plaintiffs, for the amount claimed in the petition, with interest.

Dawson & Overbeck and Follett & Kelley, for plaintiff in error.
Wilby & Wald, for defendants in error.

Before BROWN, Circuit Justice, and TAFT and LURTON, Circuit Judges.

TAFT, Circuit Judge, (after stating the facts.) The plea of the statutes of limitation was properly held bad. The argument on behalf of the defendant below was that, if the Burger contract was in force against the brewing company, that company had repudiated it early in the year 1885, so that Bullock & Co. might have brought an action for its breach in January or February of that year, more than six years before the filing of the petition. The fallacy of this argument is that the action is here for goods actually sold and delivered to the brewing company. Such an action accrued upon the delivery of the goods, and not before. It is true that, where a contracting party gives notice of his intention not to comply with the obligation of his contract, the other contracting party may accept this as an anticipatory breach of the contract, and sue for damages without waiting until the time mentioned for the completion and fulfillment of the contract by its terms; but, in order to enable the latter to sue on such an anticipatory breach, he must accept it as such, and consider the contract at an end. If he elects to consider the con-

tract still in force, he cannot recover thereafter without performing all the conditions of the contract by him to be performed.    These principles are well settled, and there are decisions by the supreme court. of the United States which leave no doubt upon the subject.    Rolling-Mill v. Rhodes, 121 U. S. 255, 264, 7 Sup. Ct. 882; Dingley v. Oler, 117 U. S. 490, 6 Sup. Ct. 850; Smoot's Case, 15 Wall. 36; Johnstone v. Milling, 16 Q. B. Div. 467; Elsas v. Meyer, 21 Wkly. Cin. Law. Bul. 346; Leake, Cont. 872, and cases there cited.    As Bullock & Co. did not elect to treat the attempted cancellation by Burger and the brewing company of the Burger contract as a repudiation of it, no right of action whatever accrued to Bullock & Co. until they had. delivered the rice thereunder.

The second and important question for our consideration is whether, on the undisputed facts of the case, there was in law an acceptance by the brewing company of the two car loads of rice, for the price of which recovery is sought.    We have no difficulty in reaching the conclusion that the contract of November, 1884, made through Burger, had been abrogated by the subsequent conduct of the parties.    Burger had notified Bullock & Co. in several letters in January of 1885 that the contract made through him had been canceled by the brewing company because the condition of that contract had been that the price named therein was the bottom price, whereas, but a few weeks subsequent, rice was sold by Bullock & Co. directly to the brewing company at five cents per hundred less. The right to cancel this contract was denied by Bullock & Co. in their correspondence with Burger.    But by letter of January 6th the brewing company notified Bullock & Co. that it had countermanded and canceled all orders through Burger, to which, in the letter of January 10th, no answer was made by. Bullock & Co.    More than this, under the Burger contract of November, 1884, of the four cars, the first was to be delivered the first week in December, and the others were to follow when ordered, about two weeks apart.    It is quite clear in our minds that the brewing company insisted, and Bullock & Co. acquiesced in the view, that the contract of December 20th, by which five cars of rice were sold with the option of 10 cars more at $2.80, was a substitute for so much of the contract through Burger as remained unperformed; and we feel quite certain that, had Burger not collected his commission through legal proceedings by garnishment from money of Bullock & Co. in the hands of the brewing company, Bullock & Co. would not have insisted upon delivering the other two cars under the Burger contract.    Bullock & Co. assumed that the surrender of Burger's commissions to him by the brewing company had been with the acquiescence of the brewing company, though in the form of legal proceedings.    Their position, evidently, was that the brewing company had recognized the existence of the Burger contract by paying Burger's commissions, and charging them to Bullock & Co.    Communicating with their lawyer in Cincinnati who had charge of this garnishment proceedings, they were advised to ship the two carloads to the brewing company, which they did.    Up to the time that the rice was received at Cincinnati, we are of the opinion that there was no obligation on the

part of the brewing company to accept it.    It is also clear that the company's receipt of the rice, and the storing it in its warehouse, were under a mistake.    It is just as clear, however, that by the 5th of December, or earlier, the company knew that the rice had been taken into the company's warehouse, and was then stored there. These facts, it knew, would be communicated through the agents of the railroad company to Bullock & Co.; and, unexplained, they constituted a clear acceptance of the rice, rendering the brewing company liable for it, under the contract upon which Bullock & Co. claimed to have the right to deliver the rice, namely, the Burger contract of November, 1884, at the price of $2.85 per hundred. . The company was under an obligation, if it did not intend to accept the rice, to notify Bullock & Co. of the mistake within a reasonable time. What was a reasonable time, under the circumstances?    There was no excuse for delay.    The facts were all known to the company. The company waited from December 5th until January 9th, when it wrote the letter, which did not reach Bullock & Co. until January 12th, in which Bullock & Co. were notified that the goods had been received under a mistake, and were held subject to their order.    In the letter of January 4th the brewing company did not explain its acts, but simply asserted that it had not accepted the rice.    For at least a month, then, it knowingly kept the rice in its storehouse without advising Bullock & Co. that it did not intend to receive and accept it, after it had acted with respect to the rice as only an owner could.    It is true that the letter of November 25th, refusing to accept the rice, was written after one car load had been received in the storehouse; but it was written upon the same day upon which the freight was paid, and was written before the brewing company was aware that Bullock & Co.'s rice had been received.    The brewing company had once before repudiated a contract, and then complied with it, so that its acceptance of the rice after its letter of November 25th was not surprising to Bullock & Co.    The price of rice was fluctuating, and was affected by the change of freight rates between the seaboard and Cincinnati, and of this fact the brewing company had been advised by Bullock & Co.    It was important, therefore, if the rice was to be rejected by the brewing company, that Bullock & Co. should know it at once.    The brewing company could not lie by for a month, with the rice in its storehouse, after it apparently had accepted the rice, and then claim that the acceptance had been under a misapprehension of facts known to it for a month.    It is well settled that receipt of goods will become an acceptance of them, if the right of rejection is not exercised within a reasonable time. Benj. Sales, (Corbin's Ed.) p. 916, § 1051, and cases cited.    To the knowledge of the brewing company, the rice was delivered to it by Bullock & Co. under the claim of right to do so by virtue of the contract with Burger of November, 1884.    Acceptance of it, therefore, or conduct equivalent to acceptance of it, implies, not only an agreement to pay for the rice, but to pay for it in accordance with the contract under which it was avowedly delivered.

In Manufacturing Co. v. Hayes, (Pa. Sup.) 26 Atl. 6, a consignee took goods consigned to him out of the possession of the carrier, and

had them hauled to his own place of business. He sent his check to the consignor for other goods purchased by him, without any reference to the goods so taken possession of by him. It was held by the supreme court of Pennsylvania that even if it was conceded that he had not ordered the goods in question, yet because he took possession of them from the railroad company, and had them hauled to his own place of business, and failed to notify the consignor of the mistake, he accepted the goods, and the instruction of the court below to find a verdict for the plaintiff for the full amount of the claim was sustained.

It is objected to the action of the court below in directing a verdict, that the facts were not so clearly proven that the case should not have been left to the jury, upon proper instructions. It is said that there was evidence tending to show that the brewing company had advised Bullock & Co. as soon as they became aware of the mistake under which these car loads of rice had been received by them into their custody. The argument is based on the statement of Overbeck that the two cars from Bullock & Co. were taken into the company's house by mistake, and that of all this the company notified Bullock & Co. at once by letter, stating that the rice was stored at their expense, and that the company refused acceptance of same. Such a statement, of course, was not competent, without showing that the letter had been lost. All of the letters of either party were introduced in evidence. The correspondence is complete. There is no room in it for a letter between that of November 25th from the brewing company to Bullock & Co., and that of Bullock & Co.'s letter of January 2d to the brewing company. Overbeck's statement can only be explained on the theory that he had forgotten when the letter first advising Bullock & Co. of the mistaken receipt of the goods was written. This was not evidence sufficient to go to the jury, because it was neither competent, nor of any weight.

Nor do we think that, under the circumstances of this case, the question of reasonable time was one for the jury. There was no excuse for any delay, after the brewing company learned of its mistaken action in regard to the rice, in notifying Bullock & Co. of it; and we have no hesitation, as a matter of law, in holding that 30 days' delay in the rejection of rice—a commodity fluctuating in its market price—was altogether unreasonable. Wiggins v. Burkham, 10 Wall. 127.

The conclusions thus reached make it unnecessary for us to consider the other assignments of error. They are founded on the action of the court in the admission and rejection of evidence relating to the cancellation of the Burger contract. Whether the contract was in fact canceled or not could not, as the case turned out, affect the brewing company's liability, because its conduct in accepting the rice under the contract was a waiver of any cancellation, if it had taken place. Objection is made to the testimony as to the fluctuation of prices in rice. This was competent to make clear the obligation upon the brewing company of promptly notifying Bullock & Co. of the rejection of the rice.

An examination of the whole record satisfies us that the judgment must be affirmed.