LittletoN, Judge,
delivered the opinion of the court:
This is an action on a contract to recover the balance of the price stated in the contract, alleged to be due and unpaid. In April 1946, plaintiff and defendant entered into a letter contract whereby plaintiff agreed to develop and fabricate for defendant certain radar equipment for use in long range navigation. In February 1947, a definitive fixed-price contract superseding the letter contract was executed, providing for a total contract price of $1,146,780.54. The contract specified that the prices contained therein were subject to revision in accordance with the provisions of Article 40 (finding 13). Article 40 required the contractor to submit to the contracting officer, within sixty days after the completion or termination of the contract, a detailed statement of the costs of performing the contract. It further provided that “Upon written demand of the Contracting Officer, made at any time within thirty days after the submission of such statement, the Contractor will negotiate to reduce the contract price to an amount representing fair and reasonable compensation for the performance of the contract.”
By a joint motion of the parties, allowed by the court on December 5, 1951, the issue before the court at this time is limited to determining whether or not the provision for revision of the contract price has become or can still be made *385 operative. Defendant concedes that if the contract price revision clause did not become or cannot now be made operative, plaintiff is entitled to recover the unpaid balance of the price stated in the contract, which has been stipulated to be $188,325.83.
Plaintiff contends that the making of a written demand by the contracting officer within the period specified by Article 40, after plaintiff submitted its statement of costs, was a condition precedent to any obligation upon it to negotiate a revision of the contract price; that no written demand was made by the contracting officer; and that as there was no waiver of the performance of the condition, plaintiff is not and cannot become obligated to negotiate to revise the contract pi’ice under the provisions of Article 40.
It is defendant’s position that the parties by their conduct waived any requirement for written notice of price revision proceedings; that plaintiff engaged in negotiations for price revision; that plaintiff cannot insist upon compliance with the technical demand provision of Article 40 because it did not complete the contract prior to the submission of its statement of costs, as required by Article 40; and, finally, that to permit plaintiff to recover the entire price stated in the contract, without revision based on costs of performance, would be to work a forfeiture against defendant and to place an excessive penalty on the failure to comply with a technicality.
The facts are that plaintiff and defendant, acting through its agent Watson Laboratories of the Air Technical Services Command, Army Air Forces (hereinafter Watson), entered into a letter contract on April 3, 1946, by the terms of which plaintiff agreed to develop and fabricate for defendant low frequency radar equipment for use in long range navigation.
Under the terms of the letter contract, which originally authorized expenditures of $95,000, plaintiff agreed to enter into negotiations with the War Department looking toward the execution of a definitive contract which would contain a detailed delivery schedule, and prices, terms, and conditions as agreed to by the parties. Work proceeded under the letter contract throughout the remainder of 1946 and into 19.47. Plaintiff gathered and transmitted to Watson the cost data *386 ‘necéssary for the preparation of a definitive contract, and under- daté of February 12, 1947, a definitive contract was executed, superseding the letter contract.
This contract, which will be referred to herein as contract ac-76, required that plaintiff furnish and supply to the Government seven items (finding 10), for a total contract price of $1,146,780.54. Article 15 (a), containing the items and prices, provided that “The prices specified herein are subject to revision in accordance with the provisions of Article 40.”[1]
In April 1948, plaintiff wrote Watson that it expected to complete all of the items required by contract ac-76 within a few weeks, and suggested that early action be taken under the clause requiring redetermination of price prior to final payment. On May 7,1948, Watson replied that there would be ample time before June 30,[2] to redetermine the price under the contract. On May 13,1948, Watson advised plaintiff that in accordance with Article 40 it was necessary that certain cost information be furnished Watson. On May 18, plaintiff replied that at such time as all of the work was completed (then estimated as June 1), cost information would be prepared in accordance with Watson’s May 13 letter and forwarded to Watson for appropriate study and review.
This exchange of correspondence was directed toward the submission by plaintiff of “a detailed statement of the costs of performing this contract” within sixty days after the completion of the contract, as required by Article 40. Both plaintiff and Watson were aware that the contract contained a price redetermination provision. Neither plaintiff nor Watson' reviewed the terms of Article 40, however, and neither of them was specifically aware of the demand provisions of the Article. Plaintiff assumed that Watson would do whatever was necessary to invoke the provision for price revision, and Watson assumed that plaintiff would negotiate to reduce the contract price without written demand to do so. Watson followed the policy and custom, with regard to all of its contracts, of conducting price redetermi-nations in accordance with the spirit of the contract articles, *387 without serving formal written demands to negotiate on the contractors.
This was the situation as it existed in May Of 1948. The information, intentions, and understandings of the-parties with respect to the price revision provisions of contract ac-76 remained unchanged from that time until September of 1949. What Occurred in September of 1949 will be the subject of discussion hereinafter. -
On November 24, 1948, plaintiff submitted what it termed .“complete detailed cost information applicable to-this contract [ac-76] from the date of its inception to final completion,” stating that it was particularly interested in completing any final price negotiations under Article 40 of the contract prior to the end of the current fiscal" year. This submission by plaintiff of what it considered to be the cost data, called for by the contract, constituted substantial performance by it in the first instance of- the requirement of Article 40 that a detailed statement of the costs Of performing the ¡contract be submitted to the contracting officer within sixty days after completion of the contract, and was intended as such performance by plaintiff. We do not interpret Article 40 as precluding the defendant to call -for further data or information as to costs, or to investigate and verify such cost statement of plaintiff before making the démand to negotiate a revision of the price stated in the contract under Article 40.
Article 40 of the contract reads in-pertinent part:
* * * Upon the written demand of the Contracting Officer, made at any time within thirty days after the submission of such statement, the Contractor will negotiate to reduce the contract price to an amount representing fair and reasonable compensation for the performance of the contract.
The contracting officer did not, either within thirty days or at any other time after the submission of plaintiff’s state-ment of costs on November 24, 1948, make written demand that plaintiff negotiate to reduce the contract price. ' A preliminary examination of the cost data indicated to the contracting officer that plaintiff had been overpaid.on contract ac-76, that is, that the total amount plaintiff had been páid *388 under the contract exceeded the costs (plus profit) listed in the statement, by some $87,027.47. It also indicated that differences, between plaintiff’s accounting and auditing by the Boston Branch, Army Audit Agency, were such as to suggest the possibility of fraud on the part of plaintiff.
On February 9, 1949, the contracting officer advised the defendant’s Auditor General that a preliminary review of the contractor’s costs had been conducted in an effort to provide a basis for the negotiation of a revised price under the price redetermination article, but that the contracting officer was not satisfied that enough information had been obtained from the. contractor or otherwise to justify further proceedings under the price clause. He requested that a searching and detailed audit be made of the contractor’s costs for the years-1946-1948, adding that the contract had been completed on' or about November 30, 1948.
On February 14, 1949, the contracting officer advised plaintiff, in connection with the statement of costs submitted by it, that careful thought had been given to the information obtained by the contracting officer’s representatives, in an effort to expedite redetermination of the contract price pursuant to the terms of Article 40, but stated that the preliminary review of the cost information in hand did not afford sufficient basis to protect adequately the Government’s interests, nor “would it be equitable to the contractor for the purpose to attempt to negotiate a revised price on the information elicited to date.” Plaintiff was further advised that the Auditor General had been requested to conduct an audit of plaintiff’s costs under contract ac-76, and it was suggested that further negotiations be held in abeyance pending receipt of the audit report.
On February 23,1949, plaintiff wrote the contracting officer indicating surprise and concern over the necessity for conducting a detailed audit prior to negotiating final settlement of the pricó under contract ac-76. Plaintiff stated, in part, that “Original commitments from your office indicated that the entire matter could be closed prior to December 31,1948, and on or about the middle of December, we were advised that final negotiations would be delayed until January 22nd. It was the opinion of your office that a final negotiated settle *389 ment by this date would still permit us to incorporate the final results of negotiation into year-end audit adjustments prior to the publication of our year-end statements. . With these understandings I was convinced that a mutually agreeable settlement [as to the contract price] could be accomplished before the end of January 1949.”
On March 3, 1949, the contracting officer advised plaintiff that the decision to require an audit “in order to lay the basis for the proper negotiation of a revised over-all price for the contract” had been reached reluctantly but with great objectivity. The audit of plaintiff’s costs on contract ac-76 was begun on April 9,1949, and continued until August 9 of that year. During the latter part of July, Watson wired plaintiff that the auditor’s report was expected soon, and suggested that “negotiation conferences” be scheduled on contract ac-76.[3]
A conference for price revision negotiation was held at plaintiff’s offices on August 23,1949. When discussion of the auditor’s report began, plaintiff’s president raised a question as tp the contracting officer’s approach to the negotiations for price redetermination, and sought to justify his position by reference to the terms of the contract. He was, through mistake, handed a preliminary draft of the contract, which did not contain provisions for price redetermination. He then stated that the contract was a fixed-price contract, and that Watson consequently owed plaintiff the unpaid balance of the contract price. Plaintiff’s president was shown a true copy of contract ac-76, containing Article 40, but he nevertheless continued to maintain that it was a fixed-price contract.
It became apparent, after further discussion of the auditor’s report, that plaintiff’s accountant had had insufficient opportunity to familiarize himself with the contents of the report of the defendant’s auditor, and the conference was adjourned until plaintiff’s accountant had an opportunity to review the report. It was never reconvened because plaintiff declined to proceed further with the price negotiation proceeding.
*390 On September 9, 1949, plaintiff’s president wrote the con-; tracting officer that attempts to discuss the provisions of. contract ac-76 relating to renegotiation of the contract price at the August 23- conference had been unsatisfactory to plaintiff, and that plaintiff had therefore, sought legal advice as to-the proper construction of the price revision provisions.. After pointing out that plaintiff’s detailed statement of the costs of performing the contract had been submitted.-on November 24, 1948, and.that no written demand to .negotiate' had-been made by the contracting officer within thirty .days thereafter, plaintiff stated-:
We aré now advised by our attorney that, since the Contracting Officer made no written demand for renegó-' tiation of the contract price within the time specified: by-Article 40 (a) - of. the contract, we are under no obliga-', tion to renegotiate as to the price, and that the contract has thereby become, in substance, a fixed price con-’ tract ■ ’ * *•- - * * ’’* it now appears that - * *-’-■* the Government owes us the .unpaid balance of the contract price. .*=*=.* . ....
Plaintiff contends that it was not and is not now obligated-to negotiate to reduce the contract price, because of the failure of- the- contracting officer to perform the condition prer • cedent to its obligation to do so. Consequently, plaintiff asserts, if is entitled to recover the unpaid balance of the contract price. ’ Defendant concedes that formal written demand ’ to negotiate was not made within thirty days after the sub-; mission by plaintiff of its statement of costs, but argue’s that' because of the course of conduct of the parties during the-period’from-November 24,1948, the date of submission of the’ plaintiff’s' statement, until September 9, 1949, plaintiff has waived oris estopped to rely upon.the requirement of Article' 40, pertaining to formal writteñ demand.
Under the terms of Article 40 written demand could and ’ perhaps should have been made, within thirty days after •’ November 24,1948, that -the contractor negotiate to reduce the contract price to ah amount representing fair and reason-^ able compensation. The making of such a demand was a, condition, precedent, to plaintiff’s obligation to negotiate, and we do not understand defendant to contend to the contrary;. *391 However, we are of the opinion that, under the facts and circumstances, plaintiff’s position in this case cannot be sustained.
As a general rule, conditions precedent must be exactly fulfilled, or no liability, can arise on the promise which such conditions qualify. Williston on Contracts (Rev. Ed.) §675. Under certain circumstances, however, it is equally well settled that the promise may be enforced despite the failure to perform the condition. Williston on Contracts (Rev. Ed.) §676. The question for decision is,; therefore, whether or not those circumstances are present in the instant case.
We have been referred in the briefs to many cases and authorities on the principles of waiver and estoppel. While the general rules relating to the principles are well defined, each case must be read in the light of the facts surrounding it, and we feel that little would be gained from a discussion of the many citations. We content ourselves with applying to the facts of the case before us what we deem to be the controlling rule of law established from a review of the cited authorities.
The doctrine of equitable estoppel is gradually being extended by the courts to prevent a wrong being done “wherever, in good conscience and honest dealing,” a repudiation of previous statements or declarations should not be permitted. Mahoning Investment Co. v. United States, 78 C. Cls. 231, cert. den., 291 U. S. 675. Morality and justice are the foundations of the doctrine, and conscience and equity its concern. Robinson v. Commissioner of Internal Revenue, 100 F. 2d 847, 849; cert. den., 308 U. S. 567; Bergeron v. Mansour, 152 F. 2d 27, 30.
One of the many branches of the doctrine is that of acquiescence. When a party with knowledge or the means of knowledge of his rights and of the material facts does what amounts to a recognition of the transaction as existing, or acts in a manner inconsistent' with its repudiation, or permits the other party to deal with the subject matter .under the belief that the transaction has been recognized, or abstains for a considerable length of time from impeaching it, so *392 that the other is reasonably induced to suppose that it is recognized, there is acquiescence, and the transaction, though it be originally impeachable, becomes unimpeachable. Mahoning Investment Co. v. United States, supra; [4] Simmons v. Burlington, Cedar Rafids & Northern Railway Co., 159 U. S. 278, 291; First Federal Trust Co. v. First National Bank, 297 Fed. 353, 356.
Plaintiff had the means of knowledge of its rights and of all the material facts, although it may not have been specifically conscious of the demand requirement of Article 40. The thirty-day period for making formal demand after plaintiff’s submission of its statement expired on December 25, 1948. Until September 9, 1949, however, plaintiff was ready and willing to engage in negotiations for price revision, and the contracting officer so understood from plaintiff’s actions and expressions.
During this period the contracting officer decided to require an audit, as he expressed it, “in order to lay the basis for the proper negotiation of a revised over-all price for the contract.” Some months later, in July of 1949, plaintiff was advised that the auditor’s report was expected soon, and it was suggested that negotiation conferences be scheduled on the contract. Such a conference was held on August 23, 1949, although, as we have previously indicated, it adjourned prior to reaching the stage of actual price redetermination of the contract.
The conclusion seems inescapable that the parties were engaged for a period of some nine or more months in negotiations leading up to and looking toward an ultimate revision of the price of contract ac-76 under the provisions of Article 40. We are clear that on the facts of the case plaintiff must be held to have acquiesced in these proceedings, and it is therefore estopped to assert the failure of the contracting officer to perform the condition precedent of making *393 formal written demand to negotiate. It follows, from what we have said, that the provisions of Article 40 relating to redetermination of the contract price became operative. The evidence of record is sufficient to show that plaintiff engaged in negotiations for the revision of the price of the contract, and we have so found. Finding 39 (e).
Defendant has asserted also that plaintiff failed to complete the contract prior to the submission of its detailed statement of costs. This argument is factually without merit. In view of the conclusion reached above, we need not pass upon the contention that to permit plaintiff to recover the stated contract price would work a forfeiture against defendant.
There are remaining in the case a number of issues not presently before the court. The case is therefore remanded to a commissioner for such further proceedings as may be necessary, in the light of our holding that the provisions of Article 40 relating to redetermination of the contract price have bécome operative.
It is so ordered.
MaddeN, Judge; Whitaker, Judge; and Jones, Chief Judge, concur.
FINDINGS OP PACT
The court makes findings of fact, based upon the evidence, the report of Commissioner W. Ney Evans, and the briefs and argument of counsel, as follows:
1. Eadar equipment used in long range navigation was described in the contract in suit[5] and is hereinafter referred to as Loran equipment.
Toward the end of World War II, the Eadiation Laboratories of Massachusetts Institute of Technology devised a new type of Loran equipment based on broadcasting at low frequencies. For the development of LF (low frequency) Loran the Eadiation Laboratories assembled and *394 stored in'a warehouse hundreds of crates of components of standard Loran equipment, in the belief that such components could be used, in whole or in part, in the construction . of LF Loran. The project for the development of LF Loran .by the - Radiation Laboratories was abandoned upon the termination of hostilities. The stored equipment remained .the property of the United States.
2. Early in 1946, the further development of LF Loran was undertaken by the Watson Laboratories (Red Bank, New Jersey) of the Air Technical Service Command, Army Air Forces, hereinafter referred to as Watson Laboratories, or Watson.
Efforts were under way by Watson Laboratories to interest manufacturers known to have large facilities in undertaking the construction of LF Loran, when plaintiff learned of the activity and solicited the business. When the manufacturers approached by Watson declined the undertaking, Watson negotiated with plaintiff.
3. Plaintiff is a Massachusetts corporation. It was and is relatively a small concern. At the end of 1945, its capital and surplus totalled just under $120,000. During that year it had handled “sales” totalling $1,325,000, from which it had made a net profit (after Federal taxes 'but before adjustments, if any, for renegotiation) of a little more than $30,000. ..
Plaintiff’s size, facilities, and performance were known to Watson Laboratories when negotiations were begun which culminated in the contract in suit. Some of the first Loran transmitters had been built by plaintiff in 1941. During the war years a substantial portion of plaintiff’s business had consisted of research and development contracts with various agencies of the Government (primarily units of the armed services) for the production of specialized items in the field of electronics.
4. At the outset there were no definite data upon which either Watson or plaintiff could predicate an estimate of 'the cost of the undertaking within limits harrow enough to warrant a fixed-price contract. The use of cost-plus- ' fixed-fee contracts was contrary to the policy of the Army *395 Air Forces. One of the obligations to be assumed by the contractor was the working up of cost. data. upon which both parties'could agree. ...
The- crated components of standard Loran equipment stored in a warehouse at Lawrence, Massachusetts, were to be .supplied to the contractor as Government Furnished Equipment. Some indication of the contents of the crates had been fastened to them or listed in a partial inventory, but the condition of such contents could be known, only upon examination. Most of the Loran components had been used in the field, and some were known to have been immersed in salt water. As the. identity, and condition of .the components became known, it would then be necessary to determine their .usability from an engineering standpoint in the design of LF Loran.
The contractor would be expected to supply the engineering services necessary to complete the design, record the data, and to fabricate the equipment,
5. On March 26,1946, plaintiff wrote Watson that a tentative estimate had been established as $704,0.00, and added:
If you are willing to let us have a letter of contract which will cover * * * our initial expenditures * * *, we can get started * * * almost immediately and have available for you by 15 May 1946, cost data which will allow the drawing up of the fixed price contract. * * *
6. A few days later (April 3, 1946) a letter contract was .signed whereby Watson placed with plaintiff an order for “* * * completion of eight * * * . slave . stations, three * * * master stations, and eight * * * monitor stations together with required drawings and maintenance data.” By the terms of the contract, plaintiff undertook “to enter into negotiations with the War Department looking to the execution of a definitive contract which will *,. * * contain a detailed delivery schedule, and prices, terms.and conditions as agreed to.by. the parties * * Initially, the letter contract authorized expenditures of $95,000. Within two weeks the authorization was increased to... $250,000, and within 90 days it was increased to $826,089.98.
*396 Watson and plaintiff had discussed the financial burden which plaintiff would assume, and Watson had agreed that certain items normally classified as indirect or overhead expenses would, for the purposes of this contract, be treated as direct costs. An understanding had also been reached relating to the necessity for partial payments, to enable plaintiff to finance its performance. Modification No. 1 of the letter contract, accepted by plaintiff on May 29, 1946, authorized partial payments on work in progress, not to “exceed 75 per cent of the cost to the contractor * * * which cost shall be determined from evidence submitted by the Contractor and which must be such as is satisfactory to the Contracting Officer * *
7. Work proceeded under the letter contract throughout 1946, and into 1947. During this time plaintiff assembled and submitted to Watson the cost data necessary for a definitive contract, and Watson prepared and submitted to plaintiff drafts of a definitive fixed-price contract, and of the necessary technical procurement clearances (specifications, as related to a research and development contract).
On January 23, 1947, plaintiff forwarded to Watson its suggestions for amendments to be made in the technical procurement clearances and a proposal, on a War Department standard procurement form, setting forth costs. The cost sheets reflected an allowance of 9.5 per cent of total cost as profit.
On February 10,1947, Watson issued Amendment No. 5 of the ' Technical Procurement Clearances, “superseding all previous TPC’s and amendments.”
The definitive contract was dated two days later, February 12,1947..
8. The same number that had been given to the letter contract, W-28-099 ac-76, was applied to the definitive contract. References hereinafter to Contract ac-76 are directed to the definitive contract. Contract ac-76 is in evidence as plaintiff’s Exhibit No. 12, which is incorporated herein by reference.
While Contract ac-76 was in process of negotiation, Watson and plaintiff also negotiated for, and ultimately entered *397 into, two other contracts relating to LF Loran, being Contracts W-28-099 ac-174 (hereinafter referred to as Contract ac-174) and W-28-099 ac-824 (hereinafter referred to as Contract ac-324).
9. Contract ac-76 provided that “this is the contract contemplated by Letter Contract * * * of 2 April 1946 * * * and * * * supersedes said Letter Contract,” and that “the date of approval * * * [by the Secretary of War] shall be * * * the true date * * The contract was so approved on May 15,1947.
Contract ac-76 further provided that “the Finance Officer, TJ. S. Army * * * Eed Bank, New Jersey is designated as the officer to make payments in accordance with this contract, * * *” and that “Watson Laboratories * * * is designated as the office having over-all administrative responsibility for this contract.”
10. Article 15 (a) of Contract ac-76 required the Contractor to “furnish and supply to the Government the services, equipment and data hereinafter described at the prices specified.” It listed seven separate items, as follows:.
Item 1. Engineering services. and materials necessary to fabricate eight * * * L. F. Loran Station Equipments * * * Lot Price_ $903,516.22
Item 1A. Engineering reports in connection with work performed under Item 1 above * * * (Price included in Item 1 * * *).
Item 2. Engineering services and materials necessary for the development and fabrication of four * * * Monitor Stations * * * @ $21,-202.54_ 84, 810.16
Item 2A. Six * * * meters * * * @ 10,031.24___ 60,187.44
Item 2B. Engineering reports in connection with work performed under Item 2 above * * * (Price included in Item 2 * * *).
Item 3. One * * * Set Manufacturer’s Drawings and Specifications * * * ■ 44,015.97
*398 Item 4. * * * Maintenance Data
■* ‡ ;* Lot_ $38,527.87
* * . * Brought Forward_ 1,131,057,66
Consultant Services_ 10, .000.00
Travel Expenses- 10, 000. "00
* * *Total Contract Price[6]_ 1,151,057.66
* * * The prices specified herein are subject to" revision in accordance with the provisions of Article 40. * * *
11. The Technical Procurement Clearances (Amendment 5, attached to and made a part of Contract ac-76) contained the following provisions pertaining to Items 1A and 2B of Article'15 (a), being-the Engineering Reports covering Items 1 and 2: •
(1) The contractor shall furnish a monthly report, in quadruplicate, of the progress made in the development and design of the equipment. * * *
(2) A final report in reproducible form, shall be submitted within thirty (30) days after completion of,the equipment, .summarizing difficulties encountered in the fabrication of the equipment, and including recommendations for future models.
12. (a) Part of the text of Article 8 of Contract ac-76 follows:
* * * Payments. The Contractor shall be paid, upon submission of properly certified invoices or vouchers, the prices stipulated herein for articles delivered and accepted or services rendered, less deductions, if any, as herein provided. * * *
(b) Part of the text of Article 44 follows:
* * * Partial Payments. Partial payments which are hereby defined as payments prior to delivery, on work in progress for the Government under this contract, may be made upon the following terms and conditions.
*399 * * * The Contracting Officer may, from time to time, authorize partial payments to the Contractor upon the property acquired or produced by it for the performance of this contract: Provided, That such partial payments shall not exceed 75 percent of the cost to the Contractor of the property upon which payment is made, which cost shall be determined from evidence submitted by the Contractor and which must be such as is satisfactory to the Contracting Officer; Provided further, That in no event shall the total of unliquidated partial payments * * * and of unliquidated advance payments, if any, made under this contract, exceed 80 per cent of the total contract price of supplies still to be delivered. * * *
13. The provisions for price revision were contained in Article 40, as follows:
(a) Within sixty days after the completion or termination of this contract, the Contractor . will submit to the Contracting Officer a detailed statement of the costs of performing this contract. Upon the written demand of the Contracting Officer, made at any time within thirty days after the submission of such statement, the Contractor will negotiate to reduce the contract price to an amount representing fair and reasonable compensation for the performance of the contract. In such negotiations the efficiency of the Contractor in production, buying and management will be given due weight.
(b) The Contractor will furnish to the Contracting Officer such other statements of actual costs of production and such other financial statements, at such times and in such form and detail, as the Contracting Officer may prescribe, and will permit such audits and examinations of its books, records and accounts as the Contracting Officer may request.
(c) If within thirty (30) days after the making of such demand (or such further period as may be fixed by written agreement) the Contracting Officer and the Contractor fail to agree to a revised price, the failure to agree shall be deemed to be a disagreement as to a question of fact which shall be disposed of in accordance with Article 12 (Disputes).
(d) The Government shall retain from amounts otherwise due the Contractor, or the Contractor shall repay to the Government if paid to him, any amount by which the contract price is found as a result of the *400 application of this Article to exceed a fair and reasonable price, as the Contracting Officer may direct.
(e) Any provision of this Article and any action thereunder shall be without prejudice to (1) the determination of the existence of any excessive profits of the Contractor under the Renegotiation Act, and (2) any Order fixing the price of items to be furnished or services to be rendered hereunder made under Section 801 of the Revenue Act of 1943.
14. Pertinent portions of Article 12, Disputes, follow:
* * * Except as otherwise specifically provided in this contract, all disputes concerning questions of fact which may arise under this contract, and which are not disposed of by mutual agreement, shall be decided by the Contracting Officer, who shall reduce his decision to writing and mail a copy thereof to the Contractor * * *. Within 30 days from said mailing the Contractor may appeal in writing to the Secretary of War, whose written decision * * * shall be final and conclusive upon the parties hereto. * * *
15. The operation of the partial payment provisions of Contract ac-76 (and presumably of Contracts ac-174 and ac-324) was of primary importance to plaintiff. In undertaking three contracts with Watson, while carrying a lesser volume of commercial production, plaintiff had placed a strain upon its finances. Watson was aware of these facts, and cooperated fully and successfully with plaintiff in the effort to lessen the strain, until April or May 1947. Thereafter, Watson’s cooperation was, for another year or more, equally well intended, but not so successful.
In April or May 1947, changes in Army auditing resulted in the reference of plaintiff’s partial payment invoices, theretofore passed upon at Red Bank or some nearby point, to the Boston Branch, Army Audit Agency, hereinafter referred to as the Boston Branch.[7]
16. (a) On January 24,1947, plaintiff wired Watson that «* * * delayed reimbursement of our invoices now total-ling $175,089.19 is causing us embarassment and expense. * * *” Watson replied on January 28, 1947, that payments would be forwarded within a few days.
*401 (b) On March 25,1947, plaintiff wrote Watson concerning nine invoices totalling $163,949.69, and added: “* * * we find ourselves with a quarter of $1,000,000 tied up in this and its sister contract * * * ac-174. * * *”
(c) On May 14,1947, plaintiff wrote Watson that: “At the suggestion of your Accounting Section, our billing procedure was revised as of March 1947. Since that time we have submitted our Invoice * * * covering March, and Invoice * * * covering April.”
(d) On May 20,1947, Watson replied: “* * * your invoices * * * March and * * * April have been approved and forwarded for payment.”
(e) On May 21,1947, the Boston Branch acknowledged to the Regional Auditor in Brooklyn the receipt “of request for audit dated 19 May 1947 * * .and advised that “report will be completed on or before 23 June 1947.” This request pertained to plaintiff’s April invoice for partial payment.
(f) On June 8, 9, and Í0,1947, plaintiff’s partial payment invoice for May went through channels from the Contracting Officer to the Resident Industrial Auditor at Watson Laboratories, to the Regional Auditor in Brooklyn, to the Boston Branch.
17. On July 3, 1947, plaintiff wrote to Watson:
* * * In executing this contract, I assumed a reasonable time for approval of monthly invoices * * * would not be in excess of a 30-day period and upon this premise the financing of this contract was predicated.
* * * the last payment received was for work accomplished prior to March 31 * '* *.
* * * monthly billings for April, May and June have been submitted * '* * [totalling] * * * $114,138.35.
* * * audit responsibilities have been transferred to * * * , Boston * * *; however, continuing responsibilities for the payments on this contract is believed to remain with * * * Watson Laboratories.
* * * the intent of the partial payment article is to provide sufficient working capital to the Contractor * * *.
*402 The letter concluded with a summary showing that as.of June 25, 1947, plaintiff had expended $493,250.98, against which (1) plaintiff had received, as partial payments, $257,886.58, and (2) Watson was withholding $235,364 in unpaid invoices totalling $114,138.25 and by the retention (of 25 percent , of costs, under Article 44; see finding 12) of $121,225.65.
18. On July 11, 1947, the Commanding Officer at Watson Laboratories replied to the letter quoted in the preceding finding:
* * * you are entirely correct * * *. The time lapse has been unreasonable and necessary ac-' tion is being taken to remedy this unsatisfactory condition. * * *
19. Remedial action was thereafter initiated by Watson Laboratories. ‘ A substantial payment was made to plaintiff early in August 1947. In the weeks and months which followed, Watson endeavored to iron out the difficulties between plaintiff’s accounting and the auditing of the Boston Branch., Plaintiff’s July and August invoices were returned to it by the Contracting Officer with suggestions for changes which would make them acceptable to the auditors. Plaintiff made the revisions, amounting to reductions totalling more than 10 percent of the original invoices, and resubmitted them with the comment:
* * * The urgency of expediting payment justifies our temporarily accepting the unexplained adjustments, which appear quite contrary to the intent of the contract * * *.
In view of the downward revision clause embodied in this contract and the substantial retainer involved, we do not see the justification for this perpetual adjustment procedure. * * *
20. On October 1,1947, plaintiff wrote to the Commanding Officer at Watson Laboratories:
Since the entree of the Boston Army Audit Service into the procedure for approving partial'payments on Contract * * * ac-76, exceedingly great difficulty has been encountered in receiving payments.
The procedure which I am asked to follow changes from month to month and is completely in disagreement *403 with the negotiations * * * upon which the * * * contract was prepared and signed.
* * * it is * * * requested that modification of the * * * contract be effected which will provide for payment of direct charges as contemplated by the protracted work which went into the preparation of this contract. * * *
21. Further conferences ensued: between "Watson and plaintiff; between Watson and the Boston Branch; and between the Boston Branch and plaintiff. On October 15, 1947, Watson wrote plaintiff:
The many conferences * * * have resulted in a plan whereby certain direct charges agreed to as such during the course of negotiations leading to the original contract shall be maintained as such on the books * * * of the Company and billed as such on the partial payment invoices. * * *
On October 18, 1947, the Contracting Officer wrote the Chief, Army Audit Agency, Boston Branch, listing .the items that had been “agreed upon during the negotiations of the subject contract to be allowed as direct charges * *
On October 24, 1947, plaintiff wrote the Contracting Officer:
The Boston Army Audit Agency has been shown the referenced letter [of October 15, from Watson to plaintiff] and indicated verbally * * * that direct charges cannot be handled in the manner prescribed in your letters without a formal contract modification.
The Audit Agency regretted their inability to put their comments in written form (since it was not their function to advise contractors) ******
. A first inclination might be to accept the present situation; however, there is good likelihood that an agency other than Watson Laboratories may appear in the “lie-determination” proceedings of the contract. Final extensive revisions of the redetermination could easily place a great and needless burden on your staff and result in great delay in obtaining final contract settlement.
It is therefore requested that a modification to the contract be issued as early as practicable which will include the procedures for recognizing the direct charges.
22. No modification of Contract ac-76 relating to “procedures for recognizing the direct charges” was ever made.
*404 By Modification No. 1 of Contract ac-76, dated October 10, and signed by plaintiff on October 21,1947, a separation was made of the' various stations required by Item 1, thereby permitting payment of the fixed price for each station as completed. The total amount was unchanged. The Modification provided:
* * * Nothing herein contained shall be construed as waiving the rights of the Government under Article 40 * * *
23. Toward the end of January 1948, Watson recognized the necessity for overtime work by plaintiff on Contract ac-76. to complete the.work prior to the expiration of the pertinent allotment, and authorized “* * * the use of overtime and * * * the payment of overtime rates * * * to the end that completion of all the work shall have been effected on/before 30 April 1948.”
In the meantime, plaintiff’s invoices continued to be sent through channels, from plaintiff to Watson to Brooklyn to Boston and back to Watson.
24. On March 31, 1948, plaintiff wrote Watson concem-ing “* * * the present status of unpaid invoices submitted * * * during the past three months which * * * amount to $135,471.26.” Plaintiff listed seven invoices under Contract ac-76, totalling $100,004.97; eight invoices under Contract ac-174, totalling $33,111.60; and four invoices under Contract ac-324, totalling $2,354.69. The letter renewed plaintiff’s “* * * requests for continued expeditious action * * * in processing * * * invoices * * and added:
* * * with the completion of * * * ac-76 and receipt of full payment for the work accomplished, our working capital will be greatly improved and the necessity for requests of this nature may be eliminated. * * *
25. (a) On April 9, 1948 (Friday), plaintiff wrote Watson that it expected to complete the fabrication of all equipment called for under Contract ac-76 “before the end of the coming week,” and to complete the drawings and instruction books “very shortly thereafter.” The letter further stated:
*405 * * * This contract * * * carries 1946 fund allotments which expire as of June 30, 1948. The contract carries a price revision clause requiring redetermi-nation of price prior to final payment, and, in view of the short period of time available between now and the end of June, I believe it necessary that very early action be taken to initiate the necessary steps to have this price revision accomplished. * * *
(b) On'May 7, 1948, Watson replied:
* * * This Division has been advised by higher echelon that there is a reasonable likelihood of funds being appropriated to replace the 1946 allotments which expire on .30 June 1948. The importance of that date is not as significant as before and this organization is not making any arrangements to reduce contract requirements, or taking any other affirmative steps to attempt to safeguard 1946 funds.
In view of the foregoing and unless otherwise advised, it is expected that there will be ample time between now and 30 June to redetermine the price under the * * * contract. You may expect that our Price Analysis Staff will contact you within the next day or so and arrange for any action necessary under the price clause.
(c) On May 13, 1948, Watson again wrote plaintiff:
With reference to your letter of 9 April and letter of this Division dated 7 May and in accordance with Article 40 of subject contract calling for price revision by mutual agreement, it is necessary that the following information be furnished: * * *.
* * * It is suggested that the above information be mailed to this office in order that a study can be made of the details presented. If a conference for clarification or adjustment is necessary, this office will contact you further.
The information requested by Watson included: “Actual costs of those items which have been completed * * *, an inventory of * * * tools, dies, * * * and * * * equipment * * * and * * * any additional data or comments which would clarify the cost presentation and assist in proper analysis * *
(d) On May 18,1948, plaintiff wrote Watson, acknowledging “* *'* your letters of May 7th and May 13th, relative to the overall price revision of subject contract,” and added:
*406 It is anticipated that delivery * * of all equipment and material called for under this contract will be accomplished by 1 June, 1948. At such time as all the required work has been completed, cost information will be prepared in accordance with * * * your letter of May 13th. This information will then be forwarded to you for appropriate study and review, and I sincerely hope that a mutually agreeable final price determination can be accomplished without undue delay.
26. By the end of May 1948, plaintiff had completed and Watson had accepted delivery of all of the equipment required by Contract ac-76, and plaintiff had submitted the final engineering reports required by Items 1A and 2B. The drawings and specifications required by Item 3 were submitted to Watson by plaintiff on June 7, 1948. As of that date, plaintiff had delivered or submitted everything the contract called for, except the maintenance data required by Item 4: During May, June, and July, 1948, Watson- paid plaintiff’s final invoices on all of the equipment except the monitor stations and the meters.
27. While substantial performance of Contract ac-76 had not in fact been completed at the time of the exchange of correspondence set forth in finding 25, the parties anticipated that it soon would be. It was apparent to them at the time that the fabrication of equipment was nearing completion, and that what remained to be done under the contract was' the paper work of completing drawings, specifications, instruction manuals, and engineering reports. Both parties knew that basic materials for this paper work were on hand, and that the necessary documents could be completed.
The emphasis upon completion of Contract ac-76 as soon as possible had changed, as far as plaintiff was concerned, from the necessity of obtaining payment from 1946 allotments of funds to Watson, to the desire to settle Contract ac-76 as a means at least of clarifying, if not strengthening, plaintiff’s financial position.
At the time of the exchange of correspondence set forth in finding 25, both plaintiff and Watson were aware of the existence of price revision provisions in Contract ac-76. Neither plaintiff nor Watson specifically reviewed the provisions of Article 40 of the contract in this connection. While *407 plaintiff was-therefore not specifically advertent to. the demand requirements of Article 40, it assumed that Watson would do the necessary to invoke the provisions for price revision. Watson, on its part, was also not specifically conscious of the demand provisions of Article 40. It was the policy and custom of Watson at the time (1) to conduct price redeterminations in accordance with the spirit of Article 40 (or similar provision) in all of its contracts, but (2) not to serve written demands on the contractors. Watson assumed that plaintiff would “negotiate to reduce the contract price” without written demand by Watson.
The exchange of correspondence set forth in finding 25 was directed toward the submission by the Contractor to the Contracting Officer of “a detailed statement of the costs of performing this contract,” which submission was required to be made “within sixty days after the completion * * * of this contract.”
The information, intentions, and understandings of the parties relative to the price revision provisions of the contract as described in this finding remained unchanged from May 1948 to September 1949.
28. The Final Engineering Eeports required by Items 1A and 2B of Contract ac-76 were submitted to Watson by plaintiff on May 28,1948. These reports summarized “difficulties encountered in the fabrication of the equipment”, and included “recommendations for future models,” as required by the technical procurement clearances.
In July 1948, the Contracting Officer wrote plaintiff that: “The final engineering report * * * has been received and studied and the following deficiencies have been noted.” The noted “deficiencies” related to technical omissions desired by Watson’s engineers, and plaintiff supplied the omissions in the interest of retaining Watson’s good will. " The additional material was not supplied until March 24,1949, and was not accepted by Watson until July 7,1949.
It is not established by the evidence that the “deficiencies” in the Final Engineering Eeport noted by Watson, or any of them, pertained to .“difficulties encountered in the. fabrication of the equipment,” or to “recommendations for- future models.” The submission of the Final Engineering Eeports *408 on May 28,1948, constituted substantial performance of the requirements of Items 1A and 2B of Contract ac-76.
29. The maintenance data required by Item 4 of Contract ac-76 were submitted to Watson by plaintiff in October and November 1948. While some corrections therein were made and omissions were supplied by plaintiff after November 24, 1948, the initial submission of the data by plaintiff completed substantial performance of the contract by it.[8]
30. On November 24, 1948, plaintiff wrote Watson:
Your attention is invited to your letter of 13 May 1948, and our response of May 18th in connection with the submission of final cost data covering Contract * * * ac-76.
* * * [Having] completed * * * all of the work requirements under the * * * contract * * * I am submitting herewith, for your approval, complete detailed cost information * * * applicable to this contract from the date of its inception to final completion. * * * this material has been prepared in accordance with each of the * * * requirements * * * in your May 13th letter, and trust that an early final settlement can be arranged.
From a company standpoint I am particularly interested in completing any final price negotiations under this contract prior to the end of the current fiscal year * * *.
If there is any further information that may be required in order to expedite a final modification to the contract, please be assured of full cooperation by this company.
While the cost data submitted with the foregoing letter was not accepted by Watson as reflecting plaintiff’s actual costs, as hereinafter indicated, the submission by plaintiff comprised substantial performance of the requirement of Article 40 that “within sixty days after the completion * * * of the contract, the Contractor will submit to the Contracting Officer a detailed statement of the costs of performing this contract,” and was intended as such performance by plaintiff.
*409 31. The Contracting Officer did not, either within thirty days or at any other time after the submission of plaintiff’s statement of costs as described in the preceding finding, make written demand of the Contractor to “negotiate to reduce the contract price * *
32. Preliminary examination of the cost data submitted by plaintiff indicated to the Contracting Officer (1) that plaintiff had been overpaid on Contract ac-76, in that the total amount paid exceeded the costs (plus profit) listed by plaintiff by $37,027.47; and (2) that differences between plaintiff’s accounting and the auditing by the Boston Branch were such as to suggest the possibility of fraud on the part of plaintiff.
On February 9, 1949, the Contracting Officer advised the Auditor General that: “This office has conducted a preliminary review of the contractor’s costs * * * in an effort to lay the basis for negotiation of a revised price under the Price Redetermination Article * * *”; that he was “not satisfied that the contractor’s books are not free of serious errors or * * * that * * * enough information has been obtained * * * to justify further proceedings under the price clause.” He then “requested that a searching and a detailed audit be made of the contractor’s costs, of every nature and description * * * for the years 1946, 1947, and 1948,” adding that “this contract * * * was completed on or about 30 November 1948.”
33. (a) On February 14, 1949, the Contracting Officer wrote plaintiff:
This office has given careful thought to the information obtained by * * * representatives of the Contracting Officer in an effort to expedite the redetermination of the contract price pursuant to the terms of the Price Redetermination Article.
It does not appear that the preliminary review of the Company’s costs has laid sufficient basis to adequately protect the interests of the Government nor would it be equitable to the contractor for the purpose to attempt to negotiate a revised price on the information elicited to date.
This office has, therefore, requested the Office of the Auditor General, Boston Field Office, to conduct an audit at your plant to determine all the costs from *410 the date of inception to the date of completion of the contract. Pending receipt of the report, it is suggested that further negotiations be held in abeyance.
This office * * * assures you that the proposed audit is deemed necessary for the proper negotiation of a new price. * * *
The Corporation’s statement of actual cost to completion of contract shows an overpayment of $37,027.47. It is requested that this sum be paid by check to the Treasurer of the United States and forwarded to this office for processing.
(b) On February 23,1949, plaintiff wrote the Contracting Officer:
I was * * * surprised and am * * * concerned over the * * * necessity for conducting a detailed audit * * * prior to negotiating final settlement.
A complete breakdown of costs * * * was forwarded to you during November 1948, with the request * * * [for] • * * * a final negotiated settlement prior to our fiscal closing * * * for the year 1948. Original commitments * * * indicated that the entire matter could be closed prior to December 31,1948, and on or about the middle of December, we were advised that final negotiations would be delayed until January 22nd. It was the opinion of your office that a final negotiated settlement by this date would still permit us to incorporate the final results of negotiation into year-end audit adjustments prior to the publication of our year-end statements. * * *
* * * you will remember * * * that shortly after the inception of the contract, Harvey Radio Laboratories requested that a resident auditor, together with a resident engineer, be assigned to this plant during performance of the required work. * * * Although * * * this procedure could not be followed, the books and records of this company have always been open * * * to representatives of your agency, and no effort has been spared by personnel of this company to furnish any requested information * * *, From time to time, recommendations from your inspectors have been requested by this company in an effort to prescribe to accounting methods most suitable to your specific requirements.
I * * * [do not] * * * discount the .responsibility of the Contracting Officer to adequately substan- *411 ti ate tbe cost data presented by this company; however' * * * ’ continued delay' in final settlement of this' contract should be unnecessary * * *.
* * * j * * * request * * * thatyou Sive further consideration to the necessity for prolonging nal settlement of this contract. * * * The Contracting Officer has a right to require a detailed audit, and should this be your final decision * •* * this company will cooperate to the utmost * * . *.
I have noted your request * * * that the overpayment of .$37,027.47 be returned * * *. T believe that the disposition of this matter can be held in abeyance until such time as I have received a reply to the previous sub j ect matter of this letter.
(c) On March 3,1949, the Contracting Officer again wrote plaintiff: ...
The decision to require an audit, in order to lay the basis for the proper negotiation of a revised over-all price for the contract, was reached' with some reluctance .but.with the greatest objectivity. * * *
Thé request * * * to allow a direct charge to cover the Company’s expenses * * * incurred * * * in the performance of the * * * audit,' must- be- denied. . .Direct charges are allowable only for the proper performance for the completion of a contract and since this contract has long since been completed, the audit assistance is in no way related to performance of' the contract * * *.
* * * it would be appreciated if your check for $37,027.47 would be sent to this office * * *.
(d) On March 22, 1949, another letter from the Con-' tracting Officer to plaintiff said:
There will be no delay in processing current invoices, regardless of the work that may be required *' • * * to audit Contract * * * ac-76. This Office sees no connection nor, as-a matter of fact, any relevancy in the delay which may be occasioned in completing the. audit of Contract * * * ac-76, to the processing of payments under Contracts * * * . ac-174 and and *' * - * ac-324. * * *
The Contracting Officer does not see how any delay in completing the audit of Contract * * * ac-76 *412 will work an unreasonable hardship on your Company. * * * your Company has already received overpayment on Contract * * * ac-76 and now owes the Government a conceded amount of $37,027.47, by your own figures. * * * However, * * * this Office does not presently intend to withhold payments on Contract * * * ac-174 or Contract * * * * * * ac-324. * * *
(e) On May 27, 1949', plaintiff wrote to the Contracting Officer:
* * * This company has not minimized their responsibility for prompt return of the overpayment on Contract * * * ac-76, but in view of the considerably greater amounts due us on partial payments of other contracts * * * we believe it * * * only * * * fair to retain the overpayment of $37,027.47 until such time as payments on other contracts have become reasonably current. At such time as this has been accomplished, you may be assured Harvey Radio Laboratories will immediately forward to your office a check in the amount of $37,027.47 * * *.
The letter said that the unpaid invoices on Contracts ac-174 and ac-324 dated back to October 1947 and totalled more than $140,000.
34. (a) The audit of plaintiff’s costs for Contract ac-76 was begun on April 18, 1949, and completed on August 9,1949.
(b) During this period work was completed on Contract ac-174, and work was nearing completion on Contract ac-324.
(c) In connection with the performance of Contract ac-324, plaintiff had found that its costs of performance would exceed the contract price. Plaintiff thereupon sought to obtain from Watson relief by way of adjustment of the contract price, and was refused such an adjustment with the reminder that the work was performed under a fixed-price contract. This incident made a marked impression on the mind of plaintiff’s president, and colored his thinking subsequently on the meaning of the term “fixed price contract.”
(d) Plaintiff’s president had participated in proceedings for statutory renegotiation of contracts, and gained the im *413 pression from the experience that renegotiation procedures began with the fixed price of the contract, which was scaled downward by negotiation between the parties, “to reduce the contract price to an amount representing fair and reasonable compensation * *
(e) Plaintiff’s president had never been called upon to take part in formal negotiations for price redetermination, as provided by Article 40 of Contract ac-76, prior to the meeting hereinafter described as being held on August 23, 1949, between representatives of plaintiff and representatives of Watson.
(f) The understanding of price redetermination which the Contracting Officer brought to the conference of August 23, 1949, was that there should first be a determination of the costs of performance, properly allowable, to which additions might be made by negotiation for profit “to reduce the contract price to an amount representing fair and reasonable compensation * *
35. On July 25,1949, Watson wired plaintiff that the auditor’s report on Contract ac-76 was expected soon and suggested that “negotiation conferences” be scheduled regarding Contracts ac-76, ac-174 and ac-324.
A conference was scheduled accordingly, and was held at plaintiff’s offices on August 23,1949.
36. At the outset of the conference, the Contracting Officer demanded that plaintiff repay immediately the overpayment of $37,027.47 on Contract ac-76. Plaintiff’s president refused. The tone of the conference was not materially bene-fitted by the expression of the demand or of the refusal.
When discussion of the auditor’s report began, plaintiff’s president demurred to the Contracting Officer’s approach (to determine properly allowable costs as the first item of business), and sought reference to the terms of the contract to support his position.
By some mischance, plaintiff’s president was handed a preliminary draft of Contract ac-76. The draft did not contain provisions for price redetermination. In the belief that he had before him a true copy of Contract ac-76, plaintiff’s president stated that the contract carried a fixed price, *414 and contained no provision for price .redetermination, wherefore Watson owed plaintiff the unpaid balance of the contract price. When Article 40 was shown to plaintiff’s president in a true copy of Contract ac-76, he admitted. that-the contract did contain provisions for price redetermination, but reaffirmed that it was a fixed-price contract..
Further discussion of the auditor’s report ensued, until it became apparent that plaintiff’s accountant had not had sufficient opportunity to study the report to.be familiar with it3 contents. The conference was thereupon adjourned, subject to being reconvened after plaintiff’s accountant had reviewed the auditor’s report.
The conference was never reconvened.
37. On September 9, 1949, plaintiff’s president wrote the Contracting Officer:
At our recent conference we attempted to discuss with you the provisions of the contract relating to renegotiation of the price, but without much satisfaction. . We therefore thought it advisable to consult our - attorney as to the proper legal construction of these provisions in the light of the facts. As you know, after completion of the contract we transmitted to you, under date of November 24,1948, a detailed statement of the costs of performing. this contract. We did not receive from you, within thirty days after our submission of such statement, any written demand that we negotiate to reduce the contract price. In fact, the first written reference on your part to renegotiation appears to have been in your letter of 14 February 1949, in which you advised us that you had requested an audit as a basis for future renegotiation.
We are now advised by our attorney that, since the Contracting Officer made no written demand for renegotiation of the contract price within the time specified by Article 40 (a) of the contract, we are under no obligation to renegotiate as to the price, and that the contract has thereby become, in substance, a fixed price contract, except as to the funds for consultant services and travel which are to reimburse the Contractor for actual expenses. It is apparent, in view- of our attorney’s conclusion of law, that our statements in previous correspondence with respect to return of the so-called “overpayment” of $37,027.47 to - us were made *415 under a complete misconception of. our legal position; and it now appears that, on the contrary, the Government owes us the unpaid balance of the contract price.
Accordingly, we submit herewith an invoice in quadruplicate, summarizing amounts heretofore invoiced, amounts heretofore paid, and the balance now invoiced.
38. (a) Plaintiff has never altered the position taken by it in the letter quoted in the preceding finding in any subsequent correspondence or conference with Watson concerning Contract ac-76.
(b) The Contracting Officer has never treated the parties’ “failure to agree” to a revised price as a “disagreement as to a question of fact” to be “disposed of in accordance with Article 12 (Disputes)The Contracting Officer has made no decision in writing pursuant to Article 12 of Contract ac-76.
39. (a) Plaintiff and the Contracting Officer both considered the determination of properly allowable costs of performance of the contract as a step preliminary to the negotiation of a revised price. The Contracting Officer expected to use the costs so determined as the basis of the negotiation. Plaintiff, realizing that the Contracting' Officer reserved to himself the actual determination of properly allowable costs, expected the Contracting Officer to use the determination as a floor toward which to pull the ceiling price fixed by the contract.
(b) The auditor’s report of plaintiff’s costs of performing the contract was taken to the conference of August 23,1949, by the Contracting Officer, with the expectation that plaintiff would object and except to portions thereof. The Contracting Officer intended to hear and consider such objections and exceptions; to review with plaintiff the understandings and agreements they had reached in the course of negotiating Contract ac-76 relating to items of direct costs; and to make his determinations accordingly, and with plaintiff’s acceptance insofar as possible.
(c) The conference of August 23, 1949, never reached the stage of discussing plaintiff’s objections and exceptions to the auditor’s report.
*416 (d) No determination of properly allowable costs of the performance of the contract was made prior to September 9, 1949.
(e) Plaintiff engaged in negotiations for the revision of the price of Contract ac-76, within the meaning of Article 40.
40. The failure of the Contracting Officer to make written demand upon plaintiff to negotiate for price revision was consistent with his policy and practice not to make such demands. Plaintiff did not know, until after September 9, 1949, that the Contracting Officer had such a policy or practice. The failure of the Contracting Officer to make the written demand was not induced by any act (of omission or commission) on the part of plaintiff.
41. (a) Prior to September 9, 1949, the requirement of Article 40 of Contract ac-76 pertaining to written demand by the Contracting Officer was not in the mind of either the Contracting Officer or plaintiff.
(b) Until September 9,1949, plaintiff was ready and willing to engage in negotiations for price revision, and the Contracting Officer so understood from plaintiff’s actions and expressions.
(c) Neither plaintiff’s attitude, nor its actions or expressions, relating to negotiation for price revision prior to September 9,1949, induced any action or change of position by the Contracting Officer pertaining thereto.
CONCLUSION OB LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes that as a matter of law the provisions of the contract relating to rede-termination of the contract price have become operative. The case is remanded to a commissioner of the court for such further proceedings as may be necessary, in the light of this conclusion.

 Article 40 appears in full in finding 13.

 The contract carried 1946 fund allotments which expired as of that date.

 Plaintiff also had two other contracts with defendant'relatlng to LF Doran (see finding 8) which were to be discussed at the suggested conference.

 In the Mahoning case (78 C. Cls. 231)' we said, at p. 247: “* * * where acquiescence is the ground of the estoppel there is usually no occasion for a change of the position of the party claiming the estoppel, and no change is made. All that is shown in these cases is that the acts of the party estopped were such as to mislead the party claiming the estoppel to continue in the course already begun, believing the same to be acceptable to the party estopped.” The facts in the case at bar certainly meet this test.

 The contract In suit contained provisions for price revision, quoted in finding IS. One of the Issues in the case is whether or not these provisions have become or can be made operative. On December 5, 1951, the court allowed a joint motion of the parties for the severance and determination of this single issue before other issues of the case are developed. These findings of fact are limited accordingly.

 In the Pretrial Conference Memorandum the parties agreed that: “Plaintiff’s actual reimbursable expenditures for consultant services were $8,500 and for travel expenses, $5,622.88, making the total contract price $1,146,780.54.” The sum of $1,600 was added to the contract price by Modification No. 2 to Contract ac-76, dated April 0, 1948. The parties also agreed that: “The difference between the fixed price stated in the contract and the amount of money paid to the plaintiff * * * under the partial payments provision of the contract is $188,325.83.”

 Within the next two years, the auditing office, became th'e Boston Branch, Air Force Auditor General. Reference to the Boston Branch is retained to avoid confusion.

 Modification No. 4 of Contract ac-76, dated November 24, 1948, and signed by plaintiff on December 3,19,48, was a mere formality.