## PENN–OHIO STEEL CORPORATION
### v.
### The UNITED STATES.
### No. 396–59.

United States Court of Claims.
Dec. 17, 1965.

David Brady, New York City, attorney of record, for plaintiff. Clendon H. Lee and O'Connor & Farber, New York City, of counsel.

Howard O. Sigmond, Washington, D. C., with whom was Asst. Atty. Gen., Edwin L. Weisl, Jr., for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS and COLLINS, Judges.

PER CURIAM:

This case was referred pursuant to Rule 45(a) (now Rule 57(a)) to Trial Commissioner Herbert N. Maletz, with directions to make findings of fact and recommendation for conclusions of law. The commissioner has done so in an opinion and report filed on September 28, 1964. Exceptions to the opinion, the recommendation for conclusion of law and certain of the findings of fact were made by the parties and, upon the filing of their briefs, the case has been submitted to the court upon oral argument of coun-

sel. The court agrees with the commissioner's findings, his opinion, and his recommended conclusion of law, as hereinafter set forth, and hereby adopts the same as the basis for its judgment in this case. Plaintiff is therefore entitled to recover for the period November 15, 1953, to October 19, 1954, with the amount of recovery to be determined pursuant to Rule 47(c) (2) and judgment is entered accordingly.

## OPINION OF COMMISSIONER

Plaintiff, Penn-Ohio Steel Corporation (Penn-Ohio), was the lessee of a Naval Industrial Reserve Plant at Birdsboro, Pennsylvania, where it engaged in the production of steel ingots and various steel products. It alleges, in essence, that in January 1952 it entered into a special or so-called "reverter agreement" of compromise and settlement with the Navy under which, among other things, (1) it was to vacate the plant within a specified time so as to permit the plant's use in connection with the Army tank program; (2) its lease was to be suspended during this period of special use; and (3) the Navy was to afford it the right to re-occupy the plant upon completion of such special use. Penn-Ohio says that it performed all its undertakings but that the Navy breached the agreement by failing and refusing to permit it to re-enter the plant when the period of special use for the tank program came to an end. It also says that the action of the Secretary of the Navy in terminating the lease some months later was not bona fide but was arbitrary and capricious. Damages of "upwards of $3,500,000" are sought for the alleged contract breaches. Defend-

ant contends that no such agreement as claimed by plaintiff was ever made by the parties. It further alleges that Penn-Ohio's tenancy expired because it failed to give notice of exercise of its renewal option. Finally, defendant argues that, in any event, the Secretary of the Navy canceled the lease pursuant to lawful authority reserved to him by statute and by the lease; that he did so in good faith and that his action was not arbitrary or capricious; and that his action, in any case, is not open to judicial review.

### I

The facts underlying the present controversy are, as follows: During World War II the Navy's Bureau of Ships (BuShips) constructed at a cost of about $7,500,000 a plant at Birdsboro, Pennsylvania (hereafter referred to as "the Birdsboro plant") for producing steel ship castings. The plant was operated in the wartime period by the Birdsboro Steel Foundry & Machine Company (hereafter referred to as "the Birdsboro company") under a lease in the form of a facilities contract which provided it an option to purchase the plant and required it to maintain the facilities at Government expense for 20 years. After the end of the war, the Navy was unsuccessful in selling or leasing the plant at adequate rental to the Birdsboro company and, therefore, terminated the latter's right to use the plant and advertised it for lease. Penn-Ohio was the successful bidder and entered into a lease in the form of a letter of intent with the Navy's Bureau of Yards and Docks (BuDocks) under terms and conditions approved by the Acting Secretary of the Navy.[1] The

1. The Military Leasing Act of 1947 (61 Stat. 774, 34 U.S.C. (1946 ed. Supp. I § 522a) authorized the Secretary of the Navy to lease real property. Other statutory provisions required the instant lease of real property to be submitted to the Armed Services Committees of Congress for approval. 58 Stat. 189, 65 Stat. 365, 40 U.S.C. (1952 ed.) §§ 551–554. However, it was the Navy's position and accepted practice that an amendment to an existing lease (as distinguished from an initial lease) did not have to be thus submitted for approval.

By regulation the Secretary delegated his authority to approve real property leases to the Office of the Assistant Secretary, Material Division; he also (1) vested in the technical Bureau having cognizance of the facility and BuDocks joint responsibility for negotiating leases, subject to Secretarial approval; and (2) vested in BuDocks responsibility for the preparation, execution and administration of leases. See Navy Department Property Redistribution and Disposal Regulation No. 2, November 1, 1946, as amended April 9, 1948. This regulation

letter of intent provided for a five-year term from June 30, 1948 to June 29, 1953, with Penn-Ohio having the option to extend the term of the lease for two additional successive terms of five years each under the same terms and conditions, by giving notice of election to extend 120 days prior to the expiration of the then existing term. The letter of intent further provided that the lease could be terminated without prior notice during a national emergency or upon 120 days notice if the Secretary determined that the interests of national defense so required. Penn-Ohio was required to pay a cash rental of $126,600 per year, and also to expend not to exceed $150,000 a year for maintenance as directed by the Navy, with the difference between the actual expenditure for directed maintenance and $150,000 per year to be carried forward from year to year. In the event of termination or expiration of the lease, the Navy had the right to direct fulfillment of the amount reserved for accrued maintenance either by performance of maintenance or by payment of cash. In addition, the Navy had the right to redetermine at any time the allocation of the amount to be paid in cash rent and the amount to be expended for obligated maintenance, not to exceed Penn-Ohio's obligation to pay $276,600 per year, plus accrued maintenance for previous years. The letter of intent also contained a provision that the parties understood it would be superseded by a formal lease.[2]

During the first several years of its occupancy of the plant,[3] Penn-Ohio had difficulty in meeting its rental obligations, a situation which did not, however, continue after 1950. The company was regarded by the Navy as a satisfactory tenant with a good record of producing steel ingots at the plant. Withal, BuShips planned in the event of mobiliza-tion to terminate Penn-Ohio's occupancy and place the Birdsboro company in possession of the plant though it purposely refrained from telling Penn-Ohio of these plans so as to prevent the possibility of losing it as a tenant during normal peace-time operations.

After the start of the Korean war, foundry capacity for producing armor cast hulls and turrets for tanks was in seriously short supply. Army Ordnance determined that the Birdsboro plant was necessary for this production; it also determined that the plant should be operated by the Birdsboro company which would manufacture the hulls and turrets under a subcontract with the Chrysler Corporation and ship these components into the geographically close Newark, Delaware tank assembly plant where Chrysler was to make medium tanks for the Army. In June 1951 the Assistant Secretary of the Navy, pursuant to Army requests, authorized (i) termination of the Penn-Ohio lease and (ii) negotiations looking toward a lease of the facilities to the Birdsboro company.

Penn-Ohio was not made aware of this decision by the Navy but in late October 1951 was told by Army Ordnance that a determination had been made that it was to be evicted from the plant to make way for the Birdsboro company. Penn-Ohio strongly protested this proposed action to a number of Government officials and agencies. Eventually, it met with Army officials in mid-November and reached agreement (1) that it would be given two weeks to submit three alternative proposals to Chrysler whereby it rather than the Birdsboro company would manufacture the armor castings at the plant, and (2) that if its proposals were not acceptable, a phasing-out schedule of its activities at the Birdsboro plant

was reissued on June 3, 1953, and vested in the Secretary initial approval authority and approval authority with respect to substantial lease amendments and renewals, including lessee options to renew.

2. There is no indication in the record that the Navy submitted the letter of intent to the Armed Services Committees of Congress for approval.

3. The rights and obligations of the Birdsboro company were suspended by the Navy for the duration of Penn-Ohio's occupancy of the plant.

would be concluded to the parties' mutual satisfaction.[4]

In early December 1951, the Under Secretary of the Army, after reviewing a proposal submitted by Penn-Ohio, advised it that the contract for the operation of the Birdsboro plant must be awarded to the Birdsboro company in view of the latter's trained supervisory personnel and experience and know-how in the steel casting field. Penn-Ohio then requested and was granted additional time to submit a second proposal for manufacturing tank castings at the Birdsboro plant in conjunction with another company which was an established producer in the steel foundry field. Penn-Ohio's second proposal, as well as supplementary information submitted by the Birdsboro company, were evaluated by a civilian advisory committee of foundry experts and by Chrysler, both of whom recommended that the Army select the Birdsboro company to operate the plant. Army Ordnance and the Under Secretary of the Army concurred and on December 21, 1951 the latter wrote the Assistant Secretary of the Navy advising that he had determined that the Birdsboro plant should be operated by the Birdsboro company to manufacture armor castings and requesting the Navy to terminate the Penn-Ohio lease and execute a new lease with the Birdsboro company. The Army (he said) was agreeable to termination of the lease on 120 days notice provided Penn-Ohio allowed limited entry rights during this period to the Army and the Birdsboro company; if it did not, he recommended that its lease be terminated under the national emergency clause (which did not require prior notice).

A few days later Penn-Ohio submitted a proposal to the Navy under which it would sublease the plant to the Birdsboro company for the duration of the Army tank program, following which it would resume occupancy. Penn-Ohio and Navy representatives met on December 29, 1951 to discuss the proposal, with the latter indicating that while they would give it further consideration, they thought it preferable to suspend Penn-Ohio's rights under the lease during the period of special use by the Birdsboro company. They also pointed out that phasing out of Penn-Ohio's right to use was a matter to be determined among the Army, Penn-Ohio and the Birdsboro company.

After this meeting the Assistant Secretary of the Navy informed the Under Secretary of the Army about Penn-Ohio's proposal to sublease the plant to the Birdsboro company and indicated that he had instructed BuShips to pursue this suggestion on the basis that he was reluctant to terminate the Penn-Ohio lease if there were some other way of achieving the Army objective, since such termination might force Penn-Ohio out of business. The time spent in negotiating such

---

4. During the meeting Penn-Ohio indicated it had possible legal rights to enjoin termination by the Navy of its lease for various reasons involving for the most part equitable considerations. The Chief of the Army Procurement Division wrote the Under Secretary of the Army after the meeting that there were "potential points of danger" in the event Penn-Ohio was not successful in staying in the plant. Thus he said that Penn-Ohio might obtain an injunction to prevent dispossession based on the following points: "(a) Time element of phasing." (b) "a Government prime contractor is not being placed in a Government-owned facility as an operator thereof," (c) "Demand court evaluation of production, price, etc.," (d) "Dispossession of small business." He indicated that Penn-Ohio could make a plea to Congressional representatives which would cause "attendant delays and difficult explanations." He also pointed out that there had yet to be a test case on the dispossession of a tenant in possession of a Government-owned facility under the "National Emergency Clause" during "this gray period of Korean crisis," and that "A test in this case particularly in view of the intended subcontractor's use thereof might freeze the use of the facility during an extended period." The question was submitted to the Judge Advocate General of the Army who expressed the opinion that Penn-Ohio would be unable to enjoin the Navy's termination of the lease under the national emergency or national defense clauses.

sublease (he wrote) would be well spent for if successfully concluded, the Birdsboro company might get possession of the plant much sooner than if Penn-Ohio's lease were terminated, in which case (he stated) it would be entitled to four months' notice.

In this setting, a meeting of BuDocks, BuShips and Penn-Ohio was scheduled for January 8, 1952. Immediately prior thereto, BuDocks and BuShips representatives conferred preliminarily and concluded that in lieu of termination, Penn-Ohio should have a right to continue the lease. They then met with Penn-Ohio representatives and reached agreement that the following tentative steps would be taken: (1) BuDocks would take the necessary steps to convert the Penn-Ohio letter of intent into a formal lease; (2) Penn-Ohio would submit in writing, for transmittal to the Army, a plan for making space available as soon as possible; (3) BuDocks would prepare a supplemental agreement giving Penn-Ohio the right to "re-lease" the Birdsboro plant a reasonable time after expiration or termination of the Birdsboro company lease, provided such event occurred within the full term of the original lease agreement, which supplemental agreement would provide for a renegotiation of the rental terms at such time as the plant could be made available to Penn-Ohio if there were then any changes in circumstances justifying a renegotiation (i. e., Penn-Ohio's occupying more or less space than it occupied under the original lease);[5] (4) BuDocks would take steps to adjust the rent payable as space was given up. It was also agreed at the meeting that Penn-Ohio would give up its right to "re-lease" the plant if another suitable plant was made available; and submit to BuDocks a schedule

indicating the method by which it would pay for accrued maintenance.[6]

On January 9, 1952, the counsel of BuShips, acting pursuant to specific oral authorization by the Assistant Secretary, discussed the matter telephonically with Penn-Ohio's counsel and reached the following agreement: (1) In lieu of terminating the Penn-Ohio lease, the right of Penn-Ohio to occupy the plant would be suspended for the period that the plant was required by the Birdsboro company for the manufacture of armor castings for the Army tank program; (2) upon completion of the Birdsboro company's use of the plant for that purpose, Penn-Ohio would have an option to return to the plant for the then remaining period of the original Penn-Ohio lease; (3) Penn-Ohio would give the Birdsboro company immediate access to part of the plant and make the balance of the plant progressively available; (4) Penn-Ohio would be allowed to use the steel-making facilities of the plant as long as possible without interfering with the Army's program; (5) Penn-Ohio would vacate the plant not later than April 28, 1952, unless the Army consented otherwise; (6) BuDocks would draft a detailed modification of the lease to give effect to the foregoing.

On January 11, 1952, counsel for BuShips sent a letter (the substance of which had been approved orally by the Assistant Secretary) to Penn-Ohio's counsel confirming the agreement the two had reached telephonically. (The letter is set forth in finding 44.)

At this juncture, as a result of the January 9 conversation between counsel for the parties, coupled with the meeting of January 8, the Navy and Penn-Ohio reached the following agreement (hereafter referred to as "the January 11,

5. At the time of this meeting it was contemplated that the Birdsboro company lease would be for a term of two years, subject to extension for two years or such longer time as would be necessary to complete the Army tank program.

6. During the meeting a BuShips representative stated that if the Penn-Ohio lease was to continue in a dormant stage, Penn-Ohio should give notice of its desire to renew at the appropriate time. There is no evidence that this statement was agreed to by the parties or that it represented their understanding.

1952 agreement"): (1) the Penn-Ohio letter of intent would be converted into a formal lease agreement; (2) in lieu of termination of its lease, Penn-Ohio's right to occupy the plant would be suspended for the period that the plant was required for the manufacture of armor castings for the Army tank program; (3) upon completion of the Birdsboro company's use of the plant for that purpose, the Navy would make the plant available to Penn-Ohio and Penn-Ohio would have the option to resume its lease and return to the plant for the then remaining term of the lease; (4) should there, however, at the time the plant was made available to Penn-Ohio, be a change in circumstances justifying renegotiation (i. e., Penn-Ohio's occupying more or less space than it originally occupied) the rental would be then renegotiated accordingly; (5) except for the foregoing modifications, the terms and conditions in the event Penn-Ohio exercised its option to resume the lease would be those specified in the original lease; (6) Penn-Ohio would waive its option to resume the lease of the plant if another plant suitable and acceptable to it was made available; (7) Penn-Ohio would give the Birdsboro company immediate access to part of the plant and progressively make the balance of the plant available; (8) Penn-Ohio would be permitted to use the steel-making facilities of the plant as long as possible without interfering with the Army's program; (9) Penn-Ohio would vacate the entire Birdsboro plant not later than April 28, 1952, unless the Army consented to further use; (10) BuDocks would adjust the rent payable by Penn-Ohio as the latter gave up space in the plant to make way for the Birdsboro company;

(11) Penn-Ohio would send BuDocks a schedule for payment of accrued maintenance; (12) BuDocks was currently drafting a detailed modification of the original Penn-Ohio lease to give effect to the foregoing and was to forward it to Penn-Ohio at an early date.

This agreement of January 11, 1952 was made with the full knowledge, oral approval and concurrence of the Assistant Secretary of the Navy and the Under Secretary of the Army. Furthermore, although the BuShips counsel, who had concluded the agreement, contemplated that its formal terms and conditions would be submitted to the Assistant Secretary for formal approval, the latter had, in effect, assured the BuShips counsel that he would approve such terms when submitted to him if they were in accordance with the agreement, and that such approval would be merely *pro forma*.

On January 16, 1952, Penn-Ohio's counsel wrote the contracting officer for BuDocks enclosing a sketch of some 100,000 square feet of the plant which he indicated Penn-Ohio was prepared to release immediately; also, he requested a copy of the memorandum of the January 8, 1952 meeting. On January 17, 1952 BuShips wrote Penn-Ohio's counsel a letter (which is reproduced in finding 50) incorporating the concluding parts of a memorandum prepared by a BuShips representative setting forth the latter's version of the January 8 conference.[7]

In reply to this communication, counsel for Penn-Ohio,[8] on January 23, 1952, sent a letter to the contracting officer of BuDocks setting forth his version of agreements reached between the parties at the January 8 conference. With re-

---

7. Two memoranda of this conference were prepared by Navy representatives, one by a BuDocks representative, the other by a BuShips representative, which memoranda are not in entire accord as to material events that occurred. Penn-Ohio was advised during the meeting that it would be furnished a complete memorandum of the conference which it was not, despite its repeated requests therefor.

8. Up to this juncture, Penn-Ohio was represented in negotiations with the Navy by two attorneys, Mortimer S. Gordon and his partner David Brady. Gordon acted on behalf of Penn-Ohio in effecting the January 11, 1952 agreement while the letter of January 23 was sent by Brady on behalf of Penn-Ohio. Brady represented Penn-Ohio in all subsequent dealings with the Navy.

spect to the terms of the suspension agreement, this letter (which is quoted in finding 51) constituted, in effect, a modification of the January 11, 1952 agreement in three respects: first, according to the January 23 letter the facilities were to be transferred to the Birdsboro company for the manufacture of armor castings required by the tank program "and for no other purpose", while the January 11 agreement did not include such restriction; second, the letter specified that the transfer contemplated a lease to the Birdsboro company for a period of two years with an option to renew for two years, which restriction was not included in the January 11 agreement; third, the letter stated that the period of occupancy by the Birdsboro company was to be added on to the term of the Penn-Ohio lease, whereas under the January 11 agreement, Penn-Ohio was given an option to return to the plant for the then remaining term of its original lease.

Penn-Ohio's letter of January 23 did not, however, represent a unilateral effort on its part to modify the agreement of January 11. For the day before sending the letter, Penn-Ohio's counsel read it over the telephone to the contracting officer of BuDocks (who had been present at the January 8 conference); the latter said he agreed with its contents but suggested it be sent to BuShips. Thereupon Penn-Ohio's counsel telephoned BuShips, was referred to an assistant counsel of that Bureau (who had also attended the January 8 conference), and read the proposed letter to him. The BuShips attorney likewise stated he agreed with it and that it was correct, but that since BuDocks was in charge of the lease, the letter should be sent to that Bureau, with a copy to BuShips. But despite the fact that the BuDocks contracting officer had thus orally agreed to the modification contained in this letter (hereafter referred to as "the January 23, 1952 modification"), he did not at any time thereafter submit such modification to the Secretary or Assistant Secretary for approval. Nor was Secretarial approval therefor ever granted as would seem required by Navy regulations.[9]

In this context, the contracting officer of BuDocks wrote Penn-Ohio on January 28, 1952 requesting immediate surrender of 100,000 square feet of space at the plant and surrender of the remaining space by April 28. His letter (which before sending he had read over the telephone to Penn-Ohio's counsel and received no objection) further stated that "In consideration of the surrender of this space at these times, the Department will negotiate a special agreement with you, in accordance with the terms agreed upon at the conference of January 8, 1952, which will suspend the operation of the lease during the period of special use." The letter concluded with the statement that "The final terms of the special agreement are, of course, subject to the approval of the Secretary."

Penn-Ohio performed its commitments to the Navy in good faith and in conformity with both the January 11, 1952 agreement and the January 23, 1952 modification. Thus it granted immediate access to the plant; surrendered some 100,000 square feet of space; and on April 28, 1952 surrendered the remainder of the premises.[10] In May 1952 it executed a formal lease with the Navy which superseded the letter of intent and contained the same terms and conditions

9. The Navy regulations that were in effect prior to June 3, 1953 contained no provision requiring Secretarial approval of lease amendments. However, since the Secretary did not specifically delegate such authority to the technical Bureaus, it would appear that authority therefor remained at the Secretarial level.

10. After vacating the Birdsboro plant, Penn-Ohio did not engage in steel ingot production because it lacked a plant facility. It did, however, maintain a nucleus of supervisors in anticipation of re-entry into the Birdsboro plant. Also, it continued its ownership and operation of three subsidiary companies which were engaged in producing auto accessories and the warehousing of steel.

except that the term under the formal lease began on July 8, 1948, while the term under the letter of intent ran from June 30, 1948.[11]

Meanwhile, on April 29, 1952, BuShips (after having obtained approval therefor from the Assistant Secretary) entered into a lease-contract with the Birdsboro company superseding the old lease with that company. The lease recited in its preamble that "it has been determined that the use of the facilities by Penn-Ohio * * * under the * * * lease with the Department be suspended during the period of * * * use [by the Birdsboro company] * * *." Among other things, the lease required an annual rental of $474,000 and afforded the Secretary the right to terminate on 60 days notice in the event he determined the plant was not required for production in connection with the tank program. The term under the lease was for two years with three options of renewal for two years each; also the Birdsboro company had the right to use the facilities in the performance of work not only for the Government but for others as well.[12]

As of May 1952 there remained for completion as between Penn-Ohio and the Navy (1) formal execution of the "reverter agreement", and (2) payment of accrued maintenance. In May 1952 Penn-Ohio submitted a schedule proposing an immediate payment of $50,000, with the balance to be paid in three yearly installments. BuDocks replied in August 1952 that this proposal for maintenance was unacceptable. Penn-Ohio representatives then met with BuDocks and BuShips representatives in the latter part of that month to discuss the two outstanding matters and protested the delay in formal execution of the "reverter agreement". At this point the assistant to the contracting officer of BuDocks commented that it could well be that the Navy would not be in a position to go through with the "reverter agreement" because it had put it beyond its power to keep it. He said that Penn-Ohio would find out what he was talking about when it got a copy of the Birdsboro company lease.[13]

In the following month (September 1952), the BuDocks contracting officer demanded that Penn-Ohio pay $292,000 for maintenance—which Penn-Ohio claimed was substantially in excess of its obligation. Another meeting was then held on December 4, 1952 between Penn-Ohio, BuShips and BuDocks representatives, at which Penn-Ohio contended it owed some $210,000 which it proposed to satisfy by paying $50,000 immediately and the balance in three annual installments. BuDocks asked that this proposal be put in writing and indicated it would be given further consideration.[14] As to the "reverter agreement", Penn-Ohio's counsel said (1) the company should have re-entry rights at the end of the two-year lease to the Birdsboro company or an extension of an additional two years, or at any time prior to the termination of the Birdsboro company's lease if that company was not using the plant to make castings for the tank pro-

11. Since Secretarial approval of the terms and conditions had been obtained in 1948, no additional Secretarial approval of the lease was obtained. The formal lease to Penn-Ohio was approved by the Armed Services Committees of Congress.

12. These latter provisions, while not at variance with the January 11, 1952 agreement, were, it is apparent, contrary to the January 23, 1952 modification which contemplated a lease to the Birdsboro company for two years with one option to renew for an additional two-year period, and also specified that the company's use of the plant would be restricted to castings required for the tank program.

13. Several days later Penn-Ohio requested and obtained a copy of that lease from BuShips.

14. In accordance with this request, Penn-Ohio wrote BuDocks about a week later that the amount for maintenance was some $209,000 rather than $210,000. It also indicated that an additional adjustment of $50,000 should be made for insurance and protection services Penn-Ohio had paid during the period December 28, 1951 to April 28, 1952, when its operations were being phased out.

gram, and (2) that the period of time Penn-Ohio was out of the plant should be added on to the term of Penn-Ohio. He contended this was his understanding of the January 8 conference and that the BuDocks contracting officer and a BuShips representative had agreed with his interpretation which he then put in his letter of January 23. BuShips representatives said that this interpretation was not in accordance with their understanding and was contrary to the minutes of the January 8 conference; the letter of January 11 from the BuShips counsel to Penn-Ohio; the BuShips letter of January 17 to Penn-Ohio; and the contracting officer's letter of January 28 to Penn-Ohio. In conclusion, the Navy representatives told Penn-Ohio they would study the matter further and advise Penn-Ohio of their decision. Some three months later, Penn-Ohio's counsel wrote BuDocks on March 18, 1952 [15] complaining that it had heard nothing from the Navy since December about formal execution of the "reverter agreement" or about Penn-Ohio's proposal concerning payment of accrued maintenance; and that if BuDocks thought a further conference was desirable, he was prepared to meet on short notice.

In the meantime, the Navy had been informed by the Army (in April 1952) that the latter might expend some $32,-000,000 in rehabilitating and expanding the Birdsboro plant, rather than $10,-000,000 as originally estimated. Also, beginning in the first part of March 1953 the Army began to evidence renewed interest in having the plant transferred to its jurisdiction mainly to obviate the rental of $474,000 a year paid by the Birdsboro company to the Navy, which was an increased cost to the Army in its procurement of castings.

With this as background, BuDocks wrote BuShips on May 1, 1953 recommending termination of the Penn-Ohio lease in the interests of national defense (rather than amending it to grant reentry rights) on the ground that the Army was in the process of expending an additional $32,000,000 on the Birdsboro plant, which (BuDocks wrote) was not known at the time approvals were obtained [in January 1952] to amend the Penn-Ohio lease. This recommendation of BuDocks met with strong protests by several BuShips representatives, particularly on the part of the BuShips counsel who had concluded the January 11, 1952 agreement with Penn-Ohio. Thus he wrote in an inter-office memorandum that "We made this complicated arrangement with our eyes wide open—and with the full knowledge and approval of the Asst. Sec. Nav. and Under Sec. Army"; that "we should not repudiate it now in the absence of compelling reasons to do so"; that he couldn't "conceive of any good reason why the Navy should go out of its way—as this appears to do—on its own motion to defeat our deal." A meeting between representatives of the two Bureaus was then held in which the participants concluded that BuDocks should offer Penn-Ohio a right of entry "as originally agreed" (which the latter Bureau did not feel Penn-Ohio would accept).[16]

Following this, the contracting officer of BuDocks wrote Penn-Ohio in the lat-

---

15. Under the formal lease Penn-Ohio had the option to extend the term of the lease beyond July 7, 1953 for two additional terms of five years each by giving notice of election to extend 120 days prior to the expiration of the then existing term; i.e., by March 9, 1953 and March 9, 1958. Penn-Ohio did not give notice of election by March 9, 1953. As of this time the Navy regulations (which were subsequently amended on June 3, 1953) did not require Secretarial approval for lease renewals under a lessee option to renew.

16. The specific purpose of the meeting was to discuss a proposed reply by BuShips to the BuDocks recommendation for terminating the Penn-Ohio lease. At the meeting the BuShips counsel stated that "the Department had cut a deal in this particular instance and although some of the terms might not be as we would have liked them, it was done on a high echelon between the Assistant Secretary of the Navy and the Assistant [sic] Secretary of the Army and that we had a moral, if not a legal obligation, to offer Penn-Ohio a supplemental agreement in accord-

ter part of July 1953 stating the Bureau was prepared to request the Secretary to approve an amendment to the Penn-Ohio lease (1) requiring payment by it of $209,000 for accrued maintenance, and (2) providing Penn-Ohio with what was in effect an option to negotiate with the Navy for the then remaining term of its lease after expiration or termination of the Birdsboro company lease. In this last respect the BuDocks proposal was a variance from the January 11, 1952 agreement which gave Penn-Ohio, upon completion of the Birdsboro company's use of the plant for the manufacture of armor castings for the Army tank program, not an option to negotiate but rather an option to resume and re-occupy the plant for the then remaining period of its lease on the terms and conditions specified in the lease, subject to the proviso that should there be, at the time the plant was made available to Penn-Ohio, a change in circumstances justifying renegotiation (i. e., Penn-Ohio's occupying more or less space than it originally occupied) the rental would then be renegotiated accordingly. The BuDocks proposal was also at variance with the January 23, 1952 modification which specified that the period of occupancy by the Birdsboro company was to be added on to the end of the term of Penn-Ohio.

Penn-Ohio replied to the BuDocks proposal in August 1953, stating it was as-

sured in January 1952 that the formal reverter agreement would be promptly prepared and executed; that as yet, almost two years later, such agreement had not been prepared for execution; that the BuDocks amendment proposed a new and different agreement from that originally agreed to almost two years ago; and that in light of the record the proposal seemed almost incredible since it was not even a modification or variation of the original agreement, but proposed an entirely new and different agreement. In the circumstances, Penn-Ohio suggested a conference with all parties to conclude a definitive and overall agreement. This letter of Penn-Ohio to BuDocks was never acknowledged or answered.

In September 1953 the Birdsboro company's contract for the manufacture of armor castings for the tank program was terminated and the production thereof was completed on November 15, 1953. At no time thereafter did the Navy make the Birdsboro plant or any other suitable plant available to Penn-Ohio; nor did it allow Penn-Ohio to resume occupancy of the Birdsboro plant which it would have done had it been permitted to exercise its option.

During the phasing out of the Birdsboro plant for manufacture of tank castings, the Army and Navy discussed at length what disposition should be made of the plant and of Penn-Ohio's re-entry rights therein. In September 1953 the

ance with our discussions." The assistant to the BuDocks contracting officer disagreed on the following grounds: (1) that it was impracticable again to lease the Birdsboro plant to Penn-Ohio after the Army need therefor for tank castings had ended since the Army was adding facilities in the amount of $32,000,000; (2) that Penn-Ohio was trying to "whittle down" what BuDocks considered due; and (3) that Penn-Ohio did not "agree with the Navy's understanding of the conditions agreed upon relative to Penn-Ohio's re-entry." An indicated above, the outcome of the meeting was that BuDocks would offer Penn-Ohio a right of entry as "originally agreed" which BuDocks did not feel Penn-Ohio would accept. BuShips position was that when this occurred "having fulfilled our moral ob-

ligation, a request for termination of Penn-Ohio lease will be submitted." Immediately after the meeting, BuShips wrote BuDocks that in light of the January 8, 1952 conference and the BuDocks letter of January 28, 1952 to Penn-Ohio, it considered the Navy had a "moral, if not legal, obligation to offer Penn-Ohio a supplementary agreement in accordance with the 8 January 1952 conference"; that BuDocks should determine whether Penn-Ohio's rights under the lease lapsed due to failure to give timely notice of renewal; that if its rights had not lapsed BuDocks should fulfil its obligation by offering Penn-Ohio an agreement in accordance with the January 8, 1952 conference, with the period of acceptance limited to a reasonable period.

Assistant Secretary of the Army repeated his request that the Navy transfer the plant to the Army because of the Army's expenditure thereon and because of its desire to eliminate the annual rental obligation of $474,000. In the following months BuDocks again requested BuShips to ask for Secretarial approval to terminate Penn-Ohio's lease for the reasons it had previously indicated. In November 1953 the Assistant Secretary of the Army notified the Navy that the last hull at the Birdsboro plant would be shipped out about November 15 and requested that the Birdsboro company lease be amended to terminate payment of rental at that date so that a substantial saving could be effected in the remaining time required for transferring the plant to Army. The Assistant Secretary of the Navy replied in December that termination of the Birdsboro company's right of occupancy would raise a question as to Penn-Ohio's re-entry rights and that termination of the Birdsboro company's rights should be held in abeyance until the latter matter was clarified. He said he understood the Army had initiated a memorandum to the Navy requesting Penn-Ohio's rights be terminated and indicated that when that request was received, the matter would be processed for final determination. A meeting was then held in early January 1954 to discuss such proposed letter from the Army to the Navy. At that meeting a BuShips representative said the Navy was quite willing to terminate Penn-Ohio's rights; he also emphasized that the Navy would not entertain a solution suggested by an Army representative that the plant be transferred with Penn-Ohio's rights still in effect, on the basis that the Navy should resolve its own problems. At the conclusion of the meeting, a BuShips attorney suggested that the Army's letter to the Navy should specifically state that termination of Penn-Ohio's rights was in the interests of national defense, and that this would make it easier for the Navy to terminate the lease agreement.

On January 11, 1954 the Assistant Secretary of the Army wrote the Secretary of the Navy asking that action be taken to void any existing agreements so that the Army might assume custody of the Birdsboro plant without encumbrances.

The reason for the Army request in this regard was related to Army mobilization planning with respect to armor castings for medium tanks. After the Korean war and continuing until 1956 facilities capable of producing such castings in the event of mobilization were in seriously short supply. To meet such needs, Army Ordnance had developed in 1952 and 1953 a "layaway" plan under which Government-owned plants and equipment would be placed on a "standby status" available for reactivation on short notice, and contractors who had last operated the plants would be engaged and given major responsibility for maintaining the plant facilities and reactivating production therein within specified time limits. In this context, Army Ordnance determined in the latter part of 1953 (1) to place the Birdsboro plant on a stand-by basis available for reactivation on 120 days notice to supply armor castings to the Chrysler tank assembly plant at Newark, Delaware; (2) to store at the Birdsboro plant the Government-owned equipment that had been furnished to Chrysler subcontractors (after having concluded that such storage would not interfere with the layaway and reactivation of the Birdsboro plant); and (3) to select the Birdsboro company as the mobilization producer.[17] In March 1954, the Birdsboro company, pursuant to Army authorization, started the layaway of the Birdsboro plant and completed it in September 1954 under a contract entered into with the Army in May 1954 requiring it to maintain the facilities in such condition that they would be reactivated for production within 120 days after notification.

In the interim, the Navy in April 1954 terminated the Birdsboro company right

17. Army Ordnance was of the view that it should, in view of such mobilization planning, have clear and unencumbered title to the plant.

to use the plant, indicating it would not object to the company's making appropriate arrangements with the Army regarding use, maintenance and protection of the facilities. Also in the same month, the Navy transferred the plant to the Army. On June 21, 1954, the Secretary of the Navy wrote Penn-Ohio that he considered that its lease had expired because of its failure to give notice of its election to renew for an additional five-year term and that to the extent that Penn-Ohio might be considered to have any right to re-enter the Birdsboro plant, the lease was "hereby" terminated in the interests of national defense effective 120 days from the receipt of the letter, i. e., on October 19, 1954.[18]

## II

■ The first task in this factual setting is to determine whether there was a meeting of the minds,[19] and if so, whether it was objectively manifested and sufficiently definite so that the major terms and conditions are reasonably capable of ascertainment. For "[a] court cannot enforce a contract unless it can determine what it is. It is not enough that the parties think that they have made a contract; they must have expressed their intention in a manner that is capable of understanding." 1 Corbin, Contracts (1951) § 107. With regard to these questions, which are essentially factual,[20] the record shows that the January 8 conference—considered in isolation—may not have resulted in mutual assent with respect to the terms of the "reverter" amendment to the Penn-Ohio lease and to the time for

the company's surrender of the plant to the Army. But it is unnecessary to reach that question since the record establishes that as a result of the conversation the next day between counsel for the parties, coupled with the previous day's understandings, the parties reached the so-called agreement of January 11 covering the major matters in issue. That agreement, it seems apparent, specified with ample certainty the consensual elements necessary to constitute a contract. Thus it contained mutual assent to such things as: the time for surrender of the plant by Penn-Ohio; suspension of its lease in lieu of termination; the period during which the suspension would be in effect; when Penn-Ohio would have the option to re-occupy the plant; the duration of the remaining term of Penn-Ohio in the event of re-occupancy; and the terms and conditions for re-occupancy, including the rent payable should it occupy the same space as heretofore (which terms and conditions were to be those specified in the original lease).

■ Nor did the parties contemplate when the January 11 agreement was effected that they would undertake further negotiations before a binding agreement was effected; to the contrary, they intended to be bound by the commitments they had then made. As the BuShips counsel who had effected the arrangement on behalf of the Navy pointed out, "the department had cut a deal in this particular instance * * *." It is quite true that the parties contemplated, in addition, execution of a formal instrument embodying the agreement that had been

18. The draft of this letter was prepared under the direction of the Chief of Bu-Docks who in an accompanying memorandum to the Secretary stated that "Although Penn-Ohio failed to send notice of extension for a five-year term beginning 8 July 1953, negotiations were being conducted at that time for a satisfactory amendment of the lease to establish Penn-Ohio's rights of re-entry." "For that reason," he continued, "it is believed the Goverment would be estopped from asserting the lease had expired."

19. "For a contract to exist there does not have to be, and rarely is, a subjective 'meeting of the minds' all along the line." WPC Enterprises, Inc. v. United States, 163 Ct.Cl. 1, 323 F.2d 874, 879 (1963). See also Restatement, Contracts (1932) §§ 20, 32, 58.

20. Byrne Organization, Inc. v. United States, 287 F.2d 582, 586, 152 Ct.Cl. 578, 585, (1961); Morse Dry Dock Co. v. United States, 77 Ct.Cl. 57, 74–76 (1933), cert. den. 291 U.S. 672, 54 S.Ct. 457, 78 L.Ed. 1061 (1934); Guss & Mowry v. United States, 61 Ct.Cl. 301, 304 (1925).

made. But the fact that such an instrument was never executed was not essential to the consummation of the agreement. United States v. Purcell Envelope Co., 249 U.S. 313, 319, 39 S.Ct. 309, 63 L.Ed. 620 (1919). See also e. g., Ship Construction & Trading Co. v. United States, 91 Ct.Cl. 419, 456 (1940), cert. den. 312 U.S. 699, 61 S.Ct. 737, 85 L.Ed. 1133 (1941); Escote Mfg. Co. v. United States, 169 F.Supp. 483, 489, 144 Ct.Cl. 452, 459, (1959); North American Iron & Steel Co. v. United States, 130 F.Supp. 723, 724 (E.D.N.Y., 1955), and cases there cited.

■ A basic additional question is whether the January 11 agreement was approved on behalf of the Government by a duly-authorized officer, since to bind the Government, the officer purporting to act on its behalf must have actual authority to do so. See e. g., Federal Crop Ins. Co. v. Merrill, 332 U.S. 380, 384, 68 S.Ct. 1, 92 L.Ed. 10, 175 A.L.R. 1075 (1947); The Floyd Acceptances, 74 U.S. (7 Wall.) 666, 19 L.Ed. 169 (1868). As to this, the record demonstrates that the Assistant Secretary of the Navy, who was authorized to approve the January 11 agreement, had been apprised of all its essential elements and granted his oral approval thereto, subject only to his later *pro forma* approval of its formal terms and conditions. See Carrier Corp. v. United States, 164 Ct.Cl. 666, 682–83, 328 F.2d 328, 337 (1964). To say that no binding agreement came into existence until he granted such *pro forma* approval and a formal document was executed "would exalt form over substance and make a nullity of the Purcell Envelope doctrine." Barclay and Barclay v. United

States, 166 Ct.Cl. 421, 333 F.2d 847, 857 (1964) [21].

■ While the January 11 agreement was thus authorized at the Secretarial level, the same was not true of the January 23 modification. It is quite correct that the contracting officer approved the modification, but not only did he lack authority to enter into a binding commitment on behalf of the Navy, he had made it clear to Penn-Ohio that Secretarial approval was essential. Nor can the contracting officer's failure thereafter to submit the modification to the Secretary serve to commit the Navy. The crucial factor is that Secretarial approval was not in fact granted, and this necessarily constitutes a fatal bar to enforcement of the modification. See Kilmer Village Corp. v. United States, 153 F.Supp. 393, 396, 139 Ct.Cl. 231, 235 (1957); Congress Construction Corp. v. United States, 314 F.2d 527, 529–530, 161 Ct.Cl. 50, 53–54 (1963), cert. den. 375 U.S. 817.

■ A further question is whether there was consideration for the agreement of January 11, 1952. Penn-Ohio says that the agreement was a settlement and compromise between the parties. It argues, too, that it surrendered and delivered immediate possession of a large part of the plant and that the Army and the Birdsboro company got possession much sooner than if the Navy terminated Penn-Ohio's lease. Defendant argues, on the other hand, that under the national emergency clause of the lease, Penn-Ohio was a tenant at will, legally obligated immediately to give up its possession of the plant and its leasehold interest on a moment's notice, and

21. The Assistant Secretary later formally approved the new lease to the Birdsboro company which recited in its preamble that "it has been determined that the use of the facilities by Penn-Ohio * * * under [its] lease with the Department, be suspended during the period of [the plant's] use [by the Birdsboro company in connection with the Army tank program]." Assuming that the January 11 agreement lacked the requisite Secretarial approval and consensual elements, it could be argued, in view of the

above provision and the course of dealings herein involved, that there was an agreement implied in fact between the Navy and Penn-Ohio covering suspension of its lease during the period of special use of the plant by the Birdsboro company. But since the January 11 agreement was approved at the Secretarial level and contained with sufficient certainty the requisite elements of mutual assent, it is not necessary to reach that question.

that it was neither giving up anything of value nor benefitting the Government by granting access, since the Navy had the right to immediate possession.

■ Relevant in this connection is the state of affairs prior to the January 11 agreement. At that juncture the Army had an urgent need to obtain possession of the plant at the earliest possible time so as to make necessary adaptations therein for the manufacture of tank castings. It was in this setting that Penn-Ohio—in the course of its efforts to be selected by the Army as the operator of the plant for this purpose—gave the Army clear indication that it might sue to enjoin its eviction of the plant by the Navy to make way for the Birdsboro company. Eventually Penn-Ohio agreed with the Army that in case its proposals to operate the plant were not found acceptable, it would conclude a phasing-out schedule of its activities at the plant to the parties' mutual satisfaction. Nevertheless, the Chief of the Army Procurement Division regarded possible litigation by Penn-Ohio to enjoin its ouster as potentially dangerous from the Army's standpoint since it might freeze the use of the plant during an extended period. As he noted, not only was a subcontractor other than a Government prime contractor to be placed in possession of the plant, there had yet to be a test case of a national emergency clause eviction in the "gray area of Korean crisis." While the Army Judge Advocate General was of the opinion that Penn-Ohio would be unable to enjoin the Navy's termination of its lease, it would be overlooking reality to assume from this that the operating Army officials were not concerned thereafter about the effect such litigation might have on the Army's need for expeditious possession of the plant. Nor is there anything in the record to indicate, or is it reasonable to conclude, that Penn-Ohio had abandoned the possibility of litigation to enjoin its eviction from the plant so as to make way for the Birdsboro company, particularly if it were unable to reach agreement with the Army on a satisfactory schedule for the phasing out of its activities at the plant. Viewed from this standpoint, the reasonable inference is that the January 11 agreement represented, in effect, a compromise between the parties, thus obviating litigation and insuring the Army's obtaining early possession of the plant.[22] Such litigation, it appears, could have delayed for some time Penn-Ohio's ouster from the plant since the action might well have involved novel legal issues and possibly required judicial evaluation of the comparative merits of the Penn-Ohio and Birdsboro company proposals in order to determine whether the Army's selection of the latter as the operator of the plant was justified. The compromise, however, effectively extinguished Penn-Ohio's basis for suit (which obviously would have been bona fide given the circumstances present here), and thus constituted adequate consideration for the Navy promise to suspend rather than terminate its lease. For it is settled law that a compromise "is supported by sufficient consideration when there is a bona fide claim which is * * * disputed or doubtful, the real consideration to each party being not the sacrifice of the right but the settlement of the dispute." 1 Williston, Contracts (3d Ed.) § 128, fn. 18, and cases there cited. See also Satterlee v. United States, 30 Ct.Cl. 31, 53 (1895); The Aviation Co. v. United States, 46 F.Supp. 491, 97 Ct.Cl. 550, 574 (1942), cert. den. 318 U.S. 771, 63 S.Ct. 759, 87 L.Ed. 1141, 97 Ct.Cl. 731 (1943). See also Goltra v. United States, 96 F.Supp. 618, 625–626, 119 Ct.Cl. 217, 255 (1951).

Also bearing on the question of legal consideration is the national emergency clause of the lease which specified that the lease could be terminated without prior notice during a national emergency. The clause did not, however, provide, in addition, that the lessee could be re-

22. As Navy representatives made clear to Penn-Ohio, the phasing out of its rights to use the plant was a matter to be de- termined between it, the Army and the Birdsboro company, rather than between the Navy and Penn-Ohio.

quired to vacate immediately. In the absence of such provision, it would seem that while termination of the lease would become effective on notice, the lessee would have a reasonable time thereafter to move out, especially when it is considered that Government-plant lessees (such as the one here) ordinarily have moved a substantial amount of heavy equipment into the plant at the outset of the lease. To impose on such lessees the obligation to remove such equipment from the plant and vacate the premises immediately on notice would seem an unduly harsh result, neither required by the language of the lease or by modern property law.[23] For in analogous situations the courts have held that a tenant at will is not required to vacate immediately on notice but is entitled to a reasonable time thereafter to enable him to remove his property and equipment from the premises. See Jones v. Temple, 87 Va. 210, 12 S.E. 404 (1890); Rutledge v. White, 206 Ala. 329, 89 So. 599 (1921); Najewitz v. City of Seattle, 21 Wash.2d 656, 152 P.2d 722 (1944); 32 Am.Jr., Landlord and Tenant § 68.[24] Since Penn-Ohio's immediate ouster by the Navy would appear to have been foreclosed, there obviously existed a bona fide dispute as to when it would vacate. Constituting adequate legal consideration in these circumstances was Penn-Ohio's promise (a) to give immediate access to part of the plant and make the balance progressively available; and (b) to surrender the entire plant within some 108 days. Furthermore, by agreeing to surrender possession of the plant within these specified periods, Penn-Ohio manifestly relinquished its apparent legal right under the national emergency clause to remain in the plant for a reasonable time after termination of its lease.

Defendant also maintains that were there in fact any agreement between the parties amending the Penn-Ohio lease, it is not contained in "an integrated writing" and thus runs afoul of the Pennsylvania statute of frauds.[25] However, Federal not local law governs the validity and construction of Federal contracts, and under Federal law there is no requirement that contracts be in writing.[26] The reason Federal contracts are controlled by Federal law was pointed out in United States v. Allegheny County, 322 U.S. 174, 183, 64 S.Ct. 908, 913, 88 L.Ed. 1209 (1944), as follows: "The purpose of the supremacy clause was to avoid the introduction of disparities, confusions and conflicts which would follow if the Government's general authority were subject to local controls.

23. It may be that this factor was a reason (1) for the Army's willingness to conclude a mutually satisfactory phasing-out schedule with Penn-Ohio in the event its proposal to operate the plant was not acceptable, and (2) for the Navy Secretary's statement to the Army that successful negotiations with Penn-Ohio would expedite obtaining possession of the plant.

24. At early common-law a tenancy at will could be terminated immediately by giving a notice to that affect. In a number of States, however, by statute or by judicial decision, the tenancy may not be terminated without notice of some length of time. See 1 Tiffany, Real Property (3d Ed.) § 161.

25. 33 Purdon's Pa.Stat.Anno. (1949) § 1. This statute requires that leases for periods in excess of three years be in writing and signed by the person to be charged. If a lease fails to comply with the statute a tenancy at will is created. To comply with the statute all the essential terms and conditions of the lease must be in writing; however, such terms and conditions may appear in several writings, viz., letters. Shaw v. Cornman, 271 Pa. 260, 114 A. 632 (1921); Llewellyn v. Sunnyside Coal Co., 242 Pa. 517, 89 A. 575 (1914); Witman v. City of Reading, 191 Pa. 134, 43 A. 140 (1899); Williams v. Stewart, 194 Pa.Super. 601, 168 A.2d 769 (1961). See also 2 Corbin Contracts (1951) §§ 498–99.

26. A statute enacted in 1862 (R.S. § 3744, 41 U.S.C. § 16) required that all contracts made by the Secretaries of War, Navy and Interior be in writing, but this statute was repealed in 1941. See 55 Stat. 743. An earlier enactment of similar import was construed by this court as a statute of frauds. Jones v. United States, 11 Ct.Cl. 733, 740–743 (1875), aff'd 96 U.S. 24, 24 L.Ed. 644 (1877).

The validity and construction of contracts through which the United States is exercising its constitutional functions, their consequences on the rights and obligations of the parties, the titles or liens which they create or permit, all present questions of federal law not controlled by the law of any state * * * " See also Baggett Transportation v. United States, 162 Ct.Cl. 570, 577, 319 F.2d 864 868 (1963); The Padbloc Company v. United States, 161 Ct.Cl. 369, 377 (1963), and cases there cited; Fansteel Metallurgical Corp. v. United States, 172 F.Supp. 268, 270–271, 145 Ct.Cl. 496, 500 (1959).

■ But even assuming that the State statute of frauds was applicable to the transaction in question, the January 11 agreement was in compliance with its requirements. For its essential terms and conditions were contained in the letter of January 11 from the BuShips counsel to Penn-Ohio, while other aspects of the agreement were reflected in the minutes of the January 8 conference, the relevant parts of which were set forth in the BuShips letter of January 17 to Penn-Ohio.

■ Defendant next says that no binding agreement with respect to modification of the Penn-Ohio lease was effected because the approval of the Armed Services Committees of Congress was never obtained as required by Navy regulations which provided that when a lease of real property has been approved at the Secretarial level, "the Chief of the Bureau of Yards and Docks shall make and execute the necessary agreements to consummate the same, after obtaining clearance from the Armed Services Committees of Congress * * *." 27 But the thrust of this argument is defeated *ab initio* for the record indicates (i) that the Navy interpreted the statute and its own regulations as requiring Congressional Committee approval only of initial lease agreements and not of subsequent amendments or modifications; 28 and (ii) that such interpretation was accepted practice. This is illustrated by the Navy's considered choice to amend the old Birdsboro company lease rather than enter into a new lease on the ground that an amendment (as contrasted with a new lease) would not require Congressional Committee approval and thus could be accomplished much quicker. See findings 18, 65. Under these circumstances it would seem inappropriate for the court, at this late date, to upset the interpretation placed on the statute and the regulations by the parties concerned; what is more, a contrary interpretation would raise serious constitutional questions. 29 Apart from this, the record is barren of any indication that there existed any understanding between Penn-Ohio and the Navy that "an indispensable pre-condition to the consummation [of the reverter amendment] was the approval by the Senate and House Armed Services Committees * * * " Congress Construction Corp. v. United States, 314 F. 2d 527, 529, 161 Ct.Cl. 50, 53 (1963),

27. 40 U.S.C. § 551 (1952) provided in part that "the Secretary of the Navy * * * or his designee, shall come into agreement with the Committee on Armed Services of the Senate and of the House of Representatives with respect to * * * (1) eases of Government-owned real property where the estimated annual rental is in excess of $25,000."

28. It will be recalled that the formal lease with Penn-Ohio was approved by the Armed Services Committees of Congress.

29. In 1957 the Attorney General issued an opinion to the effect that this statute was unconstitutional. 41 Ops.Atty.Gen. 47 (1957). See also 41 Ops.Atty.Gen. 32 (1955); Ginnane, The Control of Federal Administration by Congressional Resolution, 66 Harv.L.Rev. 569, 599 (1953). In 1960 Congress amended the statute to eliminate the approval requirement and substitute a reporting and 30-day waiting period provision. P.L. 86–500, 74 Stat. 186, 10 U.S.C. § 2662. The Senate and Conference Committee reports indicated that this action was taken because of the constitutional questions and the President's advice that he would instruct the Secretary of Defense to ignore the approval requirement. See Senate Report 1338, U.S.Code Cong. & Adm. News (1960), p. 2308; Conference Report No. 1673, id. p. 2333.

cert. den. 375 U.S. 817, 84 S.Ct. 53, 11 L.Ed.2d 52.[30]

■■■ Defendant further contends that Penn-Ohio's rights under any reverter amendment to its lease lapsed because of its failure to give notice of lease renewal 120 days before expiration of the original term of the lease (i. e., by March 9, 1953). This argument must be rejected for two reasons: (a) Notice of renewal was not required under the agreement of January 11, 1952; and (b) even if such notice was required, the requirement was waived.

It will be recalled that the January 11 agreement called for suspension of the Penn-Ohio lease during the period the plant was used by the Birdsboro company for the manufacture of tank castings for the Army, and provided Penn-Ohio an option again to lease the plant at the end of such use for the balance of its term under its original lease. In light of the fact that Penn-Ohio thus had an option wherein it could elect to "re-lease" the plant at some future date, but had no obligation to do so, it would make little sense to interpret the agreement as requiring notice of renewal of the suspended lease as an indispensable condition for continuing in effect the unexercised but extant option. For the filing of such notice would not give rise to any obligation on Penn-Ohio's part: rather, it would be a mere formality signifying that Penn-Ohio wanted to maintain its option to decide at some future time whether or not it would elect to resume its lease of the plant. Further, Penn-Ohio's failure to file notice of renewal is in itself an indication that this requirement was not part of the January 11 agreement. Throughout the period in question, Penn-Ohio had made it clear to the Navy that it was entitled to formal execution of the reverter agreement; also, it had maintained a nucleus of supervisors in anticipation of re-entry into the plant. It stands to reason in these circumstances that were a notice requirement considered applicable, Penn-Ohio would scarcely have defaulted on such requirement with attendant forfeiture of its "re-lease" option, especially since such notice would not have subjected it to obligation of any kind. From all this, the conclusion seems clear that the reasonable construction of the January 11 agreement is that during the period the Penn-Ohio lease was suspended, all Penn-Ohio's rights and obligations thereunder (including the filing of notice of election to renew such lease) were likewise suspended.[31]

■■■ But even if notice of renewal of the suspended lease were required, it is apparent that such requirement had been waived by the Bureau of Yards and Docks—the duly authorized agent of the Secretary in this respect.[32]

30. Of course, if the statute were judicially determined to be unconstitutional (a question which is unnecessary to decide), it might be that the departmental regulation predicated on its validity could be open to possible challenge as an unconstitutional condition. See e.g., South Puerto Rico Sugar Co. Trading Corp. v. United States, 167 Ct.Cl. 236, and particularly fn. 5, 334 F.2d 622, 627 (1964). But since the regulation is not applicable here, no opinion of this issue is intimated.

31. It may be noted that the Navy earlier had suspended the Birdsboro company's rights and obligations under its wartime lease during the period of Penn-Ohio's occupancy of the plant.

32. It is elementary that to constitute a waiver, the Government agent whose action is in issue must have authority to waive the requirement. Fansteel Metallurgical Corp. v. United States, 145 Ct.Cl. 496, 500–501, 172 F.Supp. 268, 270 (1959); Branch Banking & Trust Co. v. United States, 120 Ct.Cl. 72, 87–93, 98 F. Supp. 757, 766–769 cert. den. 342 U.S. 893, 72 S.Ct. 200, 96 L.Ed. 669 (1951); United States v. Certain Parcels of Land, 141 F.Supp. 300, 309 (D.Wyo., 1956). See also, Anno. 1 A.L.R.2d 338. As of March 9, 1953—the effective date of the renewal requirement—BuDocks had the responsibility under regulation for administration of the lease; no regulation then in effect required the processing of lease renewal options through the Secretarial level. It was not until June 3, 1953, that the applicable regulation was reissued to require, among other things, Secretarial approval "of any proposal to renew an outstanding lease, whether

For here authorized representatives of that Bureau negotiated with Penn-Ohio's representatives on a continuing basis for at least one year before, and for some four months after, March 9, 1953 (the final date for the exercise of the renewal option) as though Penn-Ohio had in fact filed notice of renewal and on the premise that its rights under the reverter agreement were in full force and effect. "When a party with knowledge or the means of knowledge of his rights and of the material facts does what amounts to a recognition of the transaction as existing, or acts in a manner inconsistent with its repudiation, or permits the other party to deal with the subject matter under the belief that the transaction has been recognized, or abstains for a considerable length of time from impeaching it, so that the other is reasonably induced to suppose that it is recognized, there is acquiescence, and the transaction, though it be originally impeachable, becomes unimpeachable * * *." Harvey Radio Laboratories v. United States, 115 F.Supp. 444, 448–449, 126 Ct.Cl. 383, 391 (1953), cert. den. 346 U.S. 937, 74 S.Ct. 377, 93 L.Ed. 425.[33] See also Arundel Corp. v. United States, 96 Ct.Cl. 77, 110 (1942); Thompson v. United States, 91 Ct.Cl. 166, 179 (1940); Callahan Construction Co. v. United States, 91 Ct.Cl. 538, 610 (1940). It must be borne in mind also that for a period of over a year after expiration of the renewal date in March 1953, BuShips, BuDocks and the Assistant Secretary of the Navy consistently considered that Penn-Ohio's reverter rights had not lapsed despite its failure to file timely notice of renewal.[34] "It would be unreasonable [for this court] to hold otherwise at this late stage." G. L. Christian and Associates v. United States, 312 F.2d 418, 423, 160 Ct.Cl. 1, 10 (1963), cert. den. 375 U.S. 954, 84 S. Ct. 444, 11 L.Ed.2d 314. See also Centex Construction Co. v. United States, 162 Ct.Cl. 211 (1963).

■ In sum, it is concluded that the Navy breached its agreement of January 11 (i) by not making the Birdsboro plant available to Penn-Ohio on November 15, 1953 (when the Birdsboro company's production of armor castings for the Army tank program was completed); and (ii) by not allowing Penn-Ohio then to exercise its option of re-entry which it would have done had it been so permitted by the Navy.[35]

or not such lease grants either party an option to renew." An interesting problem presented by the reissued regulation is its legal effect in a situation where prior to its reissuance, Secretarial approval was granted for a lease containing a lessee option for renewal and the Secretary, pursuant to the reissued regulation, subsequently refuses to approve the lessee's exercise of such option. Be that as it may, disposition of the present case does not require resolution of this issue.

33. In that case the contractor was required by the contract to provide the contracting officer within 60 days after completion of the contract with a written statement of costs. If the contracting officer wished to renegotiate the contract price under an appropriate contract provision, he was required to give formal written notice to the contractor within 30 days after receipt of the contractor's cost schedule. In accordance with the contract requirement, the contractor, after completing the work, submitted a cost schedule to the contracting officer. The contracting officer, however, failed to give formal written notice of his intent to renegotiate the contract price. Nevertheless the parties conducted negotiations over the cost schedule submitted which were unsuccessful, whereupon the contracting officer withheld an amount from the contract price that he determined to be excess compensation. The contractor sued for this amount, claiming that the contracting officer's failure to give the formal written notice required by the contract prohibited any renegotiation. This court held that the plaintiff by participating in the negotiations acquiesced in the transaction and was barred from challenging the failure to give formal written notice.

34. See findings 91, 92(a), 99, 100, 101, 102(b), 103, 105, 107, 109, 111, 112, 116.

35. Since the contract with the Birdsboro company for the manufacture of tank castings was terminated in September 1953, the Navy could, under the express provision of the Birdsboro company lease, have terminated that company's

■ I turn now to the question of whether or not the Secretary's termination of the lease under the national defense clause was arbitrary or capricious. Plaintiff insists that the record shows that national defense was not considered and played no part in the ultimate determination, but was invoked merely as a device or subterfuge to repudiate and abrogate an obligation which the Navy recognized but no longer wanted to keep because unanticipated expenditures indicated that it might become burdensome. Defendant, on the other hand, maintains that the needs for military preparedness then existing overwhelmingly support the Secretary's determination.

In this posture, the record shows that the Bureau of Yards and Docks had for over a year consistently pressed within the Naval establishment for a defense clause termination of the Penn-Ohio lease on the ground that the Army's expenditures in rehabilitating and making additions to the plant were some three times in excess of the amount contemplated when the agreement with Penn-Ohio was made, thus making it impracticable (in BuDocks view) to allow Penn-Ohio to resume occupancy of the plant. The record also shows that to obtain added support for terminating Penn-

Ohio's rights, Navy representatives actively encouraged the Army to make a specific termination request to the Secretary of the Navy. While the Assistant Secretary of the Army ultimately made such request, it is clear that he did so not primarily because of the Navy's suggestions in this regard, but rather because his own independent inquiry established to his satisfaction that the Army's mobilization needs required that the plant be maintained on a stand-by basis, available for reactivation on short notice in the event of war to supply armor castings for tanks, and that occupancy of the plant by Penn-Ohio would be incompatible with these objectives. Indeed, even before Navy representatives suggested that the Army request the Secretary of the Navy to terminate Penn-Ohio's rights under the lease, Army Ordnance had already made the decision (a) to place the Birdsboro plant on a stand-by basis, capable of reactivation within 120 days, to supply the Chrysler tank assembly plant with armor castings in the event of mobilization; (b) to store at the plant the Government-owned equipment that had been furnished to Chrysler subcontractors; and (c) to select the Birdsboro company as the mobilization producer.[36] Nor can this decision, considered in light of

occupancy of the plant on 60 days notice; i. e., in November 1953. See finding 68(b). Since Penn-Ohio's cause of action under the January 11 agreement first accrued on November 15, 1953, and its petition was filed on September 22, 1959, its claim manifestly is not barred by the six-year limitation period. See 28 U.S.C. § 2501. Of course, had there been Secretarial approval of the January 23, 1952 modification, the Navy would have committed an anticipatory breach in April 1952 when it entered into a lease with the Birdsboro company containing provisions at variance with such modification. Defendant points out that Penn-Ohio knew of this breach in August 1952 and that its claim is, therefore, time-barred. But since there was no anticipatory breach of the January 11 agreement, it is unnecessary to consider this question. Nevertheless, it may be observed in passing that the majority

of courts in this country hold that the statute of limitations begins to run on the date specified in the contract for performance unless the injured party elects to sue prior to that date for the anticipatory breach. See e.g., Foss-Schneider Brewing Co. v. Bullock, 59 F. 83 (6th Cir. 1893); Restatement, Contracts (1932) § 322; 4 Corbin, Contracts (1951) § 989. But see 6 Williston, Contracts (Rev. Ed.) § 2027 for some dissatisfaction with the rule.

36. Almost a year before any discussions had taken place between Navy and Army representatives concerning termination of Penn-Ohio's rights, the Secretary of the Army had informed the Secretary of Defense that the Birdsboro plant would be urgently required in the event of mobilization; and that the Army considered it essential that upon completion of the rehabilitation and expansion programs, the plant be placed on a stand-by basis.

events as they were in 1953 and 1954, be regarded as unjustified. At that period the national policy was to maintain munition production plants in a high degree of readiness capable of rapid reactivation in the event of war; heavy armor tank castings for mobilization requirements were then in seriously short supply; and the Birdsboro plant was a vital source of such components for the Chrysler Tank complex. Then too, the Army's selection of the Birdsboro company as the mobilization producer was fully consistent with the Army Ordnance policies in this respect. For the evidence establishes that it was an experienced producer of armor castings; that the quality of its production at the Birdsboro plant was above average; and that its production record seemed to have compared favorably with other sources. It would seem evident, therefore, that the Assistant Secretary of the Army's recommendation for termination of Penn-Ohio's right to re-occupy the plant was based fully on national defense considerations. Also, the record warrants the conclusion that this recommendation was a major factor for the Secretary of the Navy's termination action, and that his action in this regard was taken for the specific benefit of the Army. It is true that the Navy Secretariat was not unmindful of the Bureaus' recommendation to terminate the Penn-Ohio lease on the basis of unanticipated expenditures incurred at the plant after the bargain with Penn-Ohio was struck. But even assuming *arguendo* that termination for this reason would be unjustified under the national defense clause, it is not believed that "the possible 'taint' of [this] lower-level purpose * * * should invalidate the [Secretary's] otherwise lawful decision. This secondary consideration was the sauce which spiced the roast but added little to its nourishment." Keener v. United States, 165 Ct.Cl. 334 (1964).

Since the Secretary's termination action is supported by the record, it follows that while Penn-Ohio is entitled to recover damages because of the Navy's

breach of the agreement, its recovery must be limited to the period from November 15, 1953 to October 19, 1954, the date when termination of its rights became effective.